Marvin BIEGHLER, Appellant
(Petitioner Below),

v.

STATE of Indiana, Appellee
(Respondent Below).

No. 34S00–9207–PD–583.

Supreme Court of Indiana.

Dec. 18, 1997.

Rehearing Denied March 31, 1998.

Susan K. Carpenter, Public Defender, Kenneth L. Bird, Deputy Public Defender, Lorinda Meier Youngcourt, Special Assistant, Indianapolis, for Appellant.

Jeffrey Modisett, Attorney General, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, for Appellee.

SHEPARD, Chief Justice.

Marvin Bieghler appeals the denial of post-conviction relief concerning his 1983 conviction and death sentence for the murders of Tommy Miller and his pregnant wife, Kimberly. Bieghler raised eighteen claims in his direct appeal, and this Court affirmed in all respects. *Bieghler v. State,* 481 N.E.2d 78 (Ind.1985). On post-conviction, Bieghler raises a collection of claims under the rubric of seven arguments:

I. Ineffective assistance of appellate counsel in his direct appeal;

II. Ineffective assistance of counsel at trial;

III. Improper instruction on accomplice testimony;

IV. Error in the jury instructions;

V. Improper jury selection and jury misconduct;

VI. Cumulative error during the penalty phase, rendering his death sentence unreliable; and

VII. Constitutionality of capital sentencing statute.

We affirm the post-conviction court.

### Facts

Tommy and Kimberly Miller were found dead in the bedroom of their trailer on the morning of December 11, 1981. Tommy Miller sold marijuana supplied to him by Bieghler, who was a marijuana "wholesaler" in the

greater Kokomo area. The couple had been shot with nine rounds from an automatic .38 calibre pistol at point-blank range. A dime was found near each body.

Harold "Scotty" Brook was Bieghler's partner in his marijuana business, accompanying Bieghler on numerous occasions to Florida where Bieghler received large quantities of the drug for transportation back to Kokomo. Brook and others testified that someone had "dropped a dime" on one of Bieghler's main distributors (i.e., informed the police on him) resulting in the distributor's arrest and the confiscation of a large amount of marijuana "fronted" to him by Bieghler. This loss effectively put Bieghler out of business. The witnesses testified that Bieghler repeatedly declared he would "blow away" whoever had "dropped a dime" on his distributor. According to Brook, after Tommy Miller became the suspected "snitch," Bieghler stated on many occasions that he would get Miller.

Brook, who cut a beneficial deal with the prosecutor on unrelated charges in exchange for his testimony, testified that he and Bieghler spent the afternoon and evening of December 10, 1981, drinking beer and smoking marijuana. They eventually wound up at a bar in Galveston, Indiana, a small town in the southeast corner of Cass county. At around 10:30 p.m. Brook, Bieghler, and Brook's brother Bobby John left the bar and traveled to the Millers' trailer, which was located in a rural part of southwestern Howard county near Russiaville. Bieghler parked down the road from the trailer, walked across a field and entered. Brook was following. Upon entering the darkened trailer, Brook saw Bieghler, standing, pointing his "super .38" into one of the rooms. Brook claims he did not hear anything while in the trailer, neither gunshots nor the cry of the Millers' small child who Brook saw standing up in his nearby crib with a crying expression on his face.

Bieghler ran out of the trailer and back to the car with Brook in tow. The group proceeded to Kokomo where they picked up Bieghler's girlfriend, Thelma McVety, from work at around 11:10—11:15 p.m. After dropping McVety off at her house, Brook, his brother, and Bieghler went to the Dolphin Tavern in Kokomo, arriving at 11:30 p.m. Brook and Bieghler then went back to McVety's, where Bieghler tearfully told her that he had to go to Florida, and then left for Florida alone.

Bieghler's "super .38" was never introduced at trial, but nine shell casings found at the murder scene matched casings found at a remote rural location where Bieghler fired his gun for target practice. An expert testified that the two sets of casings were fired from the same gun, which had to have been one of only three types of automatic .38 calibre pistols, one of which was the "super .38."

Bieghler's trial counsel vigorously argued that Bieghler could not have committed the crimes during the time Brook testified the pair went to the Millers' trailer. He called several witnesses who testified about the extremely hazardous, icy road conditions around the Miller trailer that night which would have prevented a round trip from Galveston, to the trailer, and then to McVety's workplace in forty-five minutes. He also called several witnesses who said they spoke with Tommy Miller on the phone that evening after 11 p.m. Nevertheless, the jury found Bieghler guilty of two counts of murder and one of burglary, and recommended the death penalty. The trial judge sentenced Bieghler to death for the murders, but did not sentence him for the burglary.

## I. Ineffective Assistance on Direct Appeal

Bieghler claims he was denied effective assistance of counsel on his direct appeal. After reviewing his allegations, we conclude that Bieghler received constitutionally adequate representation.

### A. Standard of Review

We have applied the two-pronged standard for evaluating the assistance of trial counsel first enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), to appellate counsel ineffective assistance claims. *Lowery v. State*,

640 N.E.2d 1031, 1048 (Ind.1994).[1] Under this standard, "[j]udicial scrutiny of counsel's performance must be highly deferential," *Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. As the *Strickland* court said:

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance....

*Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065.

■ Bieghler faces an additional burden as one appealing from an adverse ruling of a post-conviction court.

> First, we require the defendant or petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. [*Lowery,* 640 N.E.2d at 1041.] This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. *Id.* (citing *Turner v. State,* 580 N.E.2d 665, 668 (Ind. 1991)). Second, we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived the defendant or petitioner of a fair trial. *Lowery,* 640 N.E.2d at 1041. We will conclude that a fair trial has been denied when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unreliable. *Id.* (citing *Best v. State,* 566 N.E.2d 1027, 1031 (Ind.1991)).

*Canaan v. State,* 683 N.E.2d 227, 229 (Ind. 1997).

**1.** All of the federal circuit courts have done the same. Lissa Griffin, *The Right to Effective Assistance of Appellate Counsel,* 97 W. Va. L.Rev. 1, 20 n. 120 (1994) (citing cases).

## B. Categories of Appellate Counsel Ineffectiveness Claims

As Professor Lissa Griffin points out, case law indicates three basic categories of alleged appellate counsel ineffectiveness. Lissa Griffin, *The Right to Effective Assistance of Appellate Counsel,* 97 W. Va. L.Rev. 1, 21–22 (1994). We discuss these three below.

### 1. Denying Access to Appeal

The first, and most serious, sort of appellate counsel error occurs when counsel's nonfeasance or malfeasance acts to deprive the appellant entirely of his right to review. *Id.* at 22. Examples of such malfeasance or nonfeasance include violating jurisdictional time limits in initiating the appeal, *see, e.g.,* Ind.Appellate Rule 2(A) (listing time limits), or failing to file necessary instruments to perfect the appeal, *see, e.g., Evitts v. Lucey,* 469 U.S. 387, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985) (failing to file "statement of appeal" required by appellate rules). Where an appellant's right to be heard on appeal is *completely* denied him by his counsel's performance, concerns of judicial economy and repose are little implicated.

### 2. Waiver of Issues

A second category of ineffective assistance claims involve appellate counsel who did not raise issues which the convict later argues should have been raised.[2] Although the convict in this instance received appellate review of at least *some* issues, the procedural prejudice from this type of error can still be formidable. For example, we have often said that "[i]ssues which were or could have been raised on direct appeal are not available for review in post-conviction." *Weatherford v. State,* 619 N.E.2d 915, 917 (Ind.1993) (citing *Brown v. State,* 261 Ind. 619, 308 N.E.2d 699 (1974)).

■ Nevertheless, "[i]neffectiveness is very rarely found in these cases." Griffin, *supra,* at 25. One reason for this is that "the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Id.* "Experi-

**2.** According to Griffin, "[t]he overwhelming majority of federal decisions regarding ineffectiveness of appellate counsel concern [this] category of claims...." Griffin, *supra,* at 25.

enced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues." *Jones v. Barnes,* 463 U.S. 745, 751–52, 103 S.Ct. 3308, 3313, 77 L.Ed.2d 987 (1983). As Justice Jackson noted,

> "Legal contentions, like the currency, depreciate through over-issue. The mind of an appellate judge is habitually receptive to the suggestion that a lower court committed an error. But receptiveness declines as the number of assigned errors increases. Multiplicity hints at lack of confidence in any one.... [E]xperience on the bench convinces me that multiplying assignments of error will dilute and weaken a good case and will not save a bad one."

*Id.* at 752, 103 S.Ct. at 3313 [3] (quoting Justice Robert H. Jackson, *Advocacy Before the United States Supreme Court,* 25 Temple L.Q. 115, 119 (1951)). Accordingly, when assessing these types of ineffectiveness claims, reviewing courts should be particularly deferential to counsel's strategic decision to exclude certain issues in favor of others, unless such a decision was unquestionably unreasonable. *See Smith v. Murray,* 477 U.S. 527, 535–36, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986).

In analyzing this sort of case, the Seventh Circuit, under its performance analysis, first looks to see whether the unraised issues were significant and obvious upon the face of the record. If so, that court then compares these unraised obvious issues to those raised by appellate counsel, finding deficient performance "only when ignored issues are clearly stronger than those presented." *Gray v. Greer,* 800 F.2d 644, 646 (7th Cir.1986), *quoted in Mason v. Hanks,* 97 F.3d 887, 893 (7th Cir.1996); *see also Mayo v. Henderson,* 13 F.3d 528, 532 (2d Cir.1994) (habeas petitioner must show counsel omitted "significant and

obvious issues while pursuing issues that were clearly and significantly weaker.") If this analysis demonstrates deficient performance by counsel, the court then examines whether "the issues which ... appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial," *Gray,* 800 F.2d at 647, as the ultimate issue under the prejudice prong is "whether, but for counsel's errors, there is a reasonable probability that the outcome of the proceeding [here, [appellant's] direct appeal] would have been different.'" *Mason,* 97 F.3d at 893 (quoting *Freeman v. Lane,* 962 F.2d 1252, 1258 (7th Cir. 1992)).

■ The Seventh Circuit's approach comports with our own performance prong jurisprudence; we consider the totality of an attorney's performance to determine whether the client received constitutionally adequate assistance. *See Spranger v. State,* 650 N.E.2d 1117, 1124 (Ind.1995); *Short v. State,* 539 N.E.2d 939, 944 (Ind.1989) (appellant must show appellate court "the evidence as a whole leads unmistakably and unerringly to the conclusion" that his attorney afforded ineffective assistance); *Hunter v. State,* 578 N.E.2d 353, 356 (Ind.1991) ("[I]solated instances of poor strategy or bad tactics do not necessarily amount to ineffectiveness of counsel."). Under this analysis, the reviewing court should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the precedent available to counsel when that choice was made. *See, e.g., Mason,* 97 F.3d at 894–97 (reviewing relevant precedent decided before appellant's trial and direct appeal to determine whether omitted issue was "one of considerable substance").

---

**3.** As the Ninth Circuit has said:
Like other mortals, appellate judges have a finite supply of time and trust; every weak issue in an appellate brief or argument detracts from the attention a judge can devote to the stronger issues, and reduces appellate counsel's credibility before the court. For these reasons, a lawyer who throws in every arguable point—"just in case"—is likely to serve her client less effectively than one who concentrates solely on the strong arguments.
*Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir. 1989).

### 3. Failure to Present Issues Well

A third category of appellate ineffectiveness claims allege that although counsel raised particular issues, counsel's *presentation* of them was inadequate in some way. Griffin, *supra*, at 23. This category includes filing an inadequate appellate brief, *see, e.g., Adams v. State*, 261 Ind. 191, 301 N.E.2d 368 (1973), and failing to supply the appellate court with pertinent portions of the trial transcript, *Burton v. State*, 455 N.E.2d 938, 939 (Ind.1983); Griffin, *supra*, at 24 (discussing cases).

Sometimes, appellate counsel's work is so deficient that an issue, though technically raised, is deemed waived for failure to present cogent argument and/or cite facts in the record supporting the claim. *See, e.g., Goliday v. State*, 526 N.E.2d 1174, 1175 (Ind. 1988); *Ashford v. State*, 464 N.E.2d 1298, 1302 (Ind.1984); *Burton*, 455 N.E.2d at 940. In other cases, however, the reviewing court is still able to reach the issue on its merits, even though counsel's presentation of it was less than stellar. *See, e.g., Ingram v. State*, 508 N.E.2d 805, 808 (Ind.1987).

When counsel's presentation of a claim on appeal is so deficient the reviewing court deems it waived, the appellant is in little better position than if counsel had failed to raise the issue in the first place. Counsel's representation in its entirety is nevertheless still the touchstone of determining whether counsel's performance fell below an objective standard of reasonableness. A court should not find deficient performance for issues raised but deemed waived when the advancement of those issues would have required advocacy of a new adjudicatory standard or reasoning that would have been novel at the time of appellant's appeal.[4] Finally, even when counsel's performance is found constitutionally deficient under this analysis, appellant must still show a reasonable probability that, because of counsel's deficiencies, the convictions are fundamentally unfair or unreliable. *Legue v. State*, 688 N.E.2d 408 (Ind.1997).

Claims of inadequate presentation of certain issues, when such were *not* deemed waived in the direct appeal, are the most difficult for convicts to advance and reviewing tribunals to support. *See* Griffin, *supra*, at 23 (finding these types of claims "almost always unsuccessful"). We believe this to be true for two reasons.

First, these claims essentially require the reviewing tribunal to re-view specific issues it has already adjudicated to determine whether the new record citations, case references, or arguments would have had any marginal effect on their previous decision. Thus, this kind of ineffectiveness claim, as compared to the others mentioned, most implicates concerns of finality, judicial economy, and repose while least affecting assurance of a valid conviction.

Second, an Indiana appellate court is not limited in its review of issues to the facts and cases cited and arguments made by the appellant's counsel. We commonly review relevant portions of the record, perform separate legal research, and often decide cases based on legal arguments and reasoning not advanced by either party. *See, e.g., Gregory-Bey v. State*, 669 N.E.2d 154, 158 (Ind. 1996) (finding potential double jeopardy issue not addressed by either party and ordering a remand). While impressive appellate advocacy can influence the decisions appellate judges make and does make our task easier, a less than top notch performance does not necessarily prevent us from appreciating the full measure of an appellant's claim,[5] *see, e.g.,*

---

4. For example, we often find claims alleging a violation of an Indiana constitutional provision waived for lack of analysis and argument independent of that provided for the provision's federal analog. *See, e.g., Bivins v. State*, 642 N.E.2d 928, 936 n. 1 (Ind.1995); *Fair v. State*, 627 N.E.2d 427, 430 n. 1 (Ind.1993); *Martin v. State*, 537 N.E.2d 491, 494 n. 3 (Ind.1989). Such waivers, however, would not amount to deficient performance when there is no prior precedent

supporting a separate analysis under our Indiana Constitution.

5. Judge Frank Coffin of the 1st Circuit has described well the variety of influences that affect an appellate judge's decision-making:

> One reads a good brief from the appellant; the position seems reasonable. But a good brief from appellee, bolstered perhaps by a trial judge's opinion, seems incontrovertible.

*Ingram v. State,* 508 N.E.2d 805, 808 (Ind. 1987) (while brief was not "of the highest quality," it "sufficiently enabled the court to reach the issues"), or amount to a "breakdown in the adversarial process that our system counts on to produce just results," *Strickland,* 466 U.S. at 696, 104 S.Ct. at 2069. As Justice Brennan wrote:

> The Court's opinion ... seems to overstate somewhat the lawyer's role in an appeal. While excellent presentation of issues, especially at the briefing stage, certainly serves the client's best interests, I do not share the Court's implicit pessimism about appellate judges' ability to recognize a meritorious argument.... If the quality of justice in this country really depended on nice gradations in lawyers' rhetorical skills, we could no longer call it "justice." Especially at the appellate level, I believe that for the most part good claims will be vindicated and bad claims rejected, with truly skillful advocacy making a difference only in a handful of cases.

*Jones v. Barnes,* 463 U.S. 745, 762, 103 S.Ct. 3308, 3318, 77 L.Ed.2d 987 (1983) (Brennan, J., dissenting). When the issues presented by an attorney are analyzed, researched, discussed, and decided by an appellate court, deference should be afforded both to the attorney's professional ability and the "appellate judges' ability to recognize a meritorious argument." *Id.*

■ For these reasons, an ineffectiveness challenge resting on counsel's presentation of a claim must overcome the strongest presumption of adequate assistance. Judicial scrutiny of counsel's performance, already "highly deferential," *Spranger v. State,* 650 N.E.2d 1117, 1121 (Ind.1995), is properly at its highest. Relief is only appropriate when the appellate court is confident it would have ruled differently.

> Discussion with the law clerks in chambers casts doubt on any tentative position. Any such doubt may be demolished by oral argument, only to give rise to a new bias, which in turn may be shaken by the postargument conference among the judges. As research and writing reveal new problems, the tentative disposition of the panel of judges may appear

## C. Bieghler's Appellate Counsel Ineffectiveness Claims

Bieghler makes several claims about the lawyer in his direct appeal. We review these based upon the distinctions in appellate counsel ineffectiveness claims noted above.

### 1. Claims Raised and Addressed on their Merits

There are five claims we addressed on direct appeal that Bieghler now says were inadequately presented by his lawyer.

■ *(a) Sufficiency of the Evidence.* While Bieghler's brief sets out a great deal of evidence which he alleges casts significant doubt over whether he could have been the killer of Thomas and Kimberly Miller, he does not indicate which pieces of evidence, if any, were not considered by this Court the last time. Comparison of Bieghler's brief and our opinion indicates that a great deal of the evidence he now cites was in fact considered, *see Bieghler v. State,* 481 N.E.2d 78, 84–86 (Ind.1985), although we need not perform such comparison to reach our decision here. Bieghler's current approach is to point to general errors in counsel's overall performance, (*see* Appellant's Br. at 15–16), regurgitating evidence from the trial record, and asserting that "[u]nder the totality of the Circumstances [sic], the evidence was insufficient to support Bieghler's convictions." (Appellant's Br. at 27.) He says little about what counsel should have done differently to provide more "meaningful" adversarial testing *on this issue.* Thus we are left with the assertion that because the evidence of innocence was so overwhelming, the only possible explanation for this Court's ruling is counsel's inadequate performance. Such *res ipsa loquitur* reasoning does not satisfy the performance prong and is precisely the sort of argument the doctrine of res judicata was designed to prevent.

> wrong. The opinion is written and circulated, producing reactions from the other judges, which again change the thrust, the rationale, or even the result. Only when the process has ended can one say that the decision has been made, after as many as seven turns in the road. Frank M. Coffin, *The Ways of a Judge—Reflections from the Federal Appellate Bench* 63 (1980).

**(b) Prosecutorial Comment on Post–Arrest Silence.** Bieghler claims that counsel "inadequately raised and argued the fundamental error of the state's use of Bieghler's post-arrest silence for impeachment purposes." (Appellant's Br. at 27.) Bieghler claims three specific performance errors: first, his counsel did not "set out the state's questions and argument concerning Bieghler's post-arrest silence, nor cite the record;" second, his counsel did not "cite to Indiana law or the Indiana Constitution;" and third, his "entire argument was just two pages long." (*Id.*)

Regarding counsel's failure to cite Indiana law or our Constitution, Bieghler does not tell us much, such as identifying some pre-June 1984[6] Indiana precedent which would have helped the argument. As for the space devoted to this claim in the appellate brief, our review of the brief shows a well-advocated claim that references federal authority, spells out the law, and makes a reasonable application of that law to the facts. Finally, though counsel should have cited the record, his oversight did not hinder our review, as our opinion quotes most of the transcript colloquies which Bieghler now argues counsel inadequately omitted. *See Bieghler,* 481 N.E.2d at 91. There was nothing unreasonable or prejudicial about counsel's presentation of this claim.

**(c) Prosecutorial Misconduct.** Counsel raised this issue on direct appeal and supported it by pointing to allegedly improper statements in the prosecutor's closing arguments, but Bieghler says counsel should have also argued that "the state ... committed misconduct by introducing inadmissible evidence attempting to show that Bieghler was of such poor moral character that it was obvious he had committed the murders and by urging the jurors to convict Bieghler on these grounds." (Appellant's Br. at 33.) Review of Bieghler's direct appeal brief, (*see* P.C.R. at 4618, Br. at 84–88), and our previous opinion, *see Bieghler,* 481 N.E.2d at 89–91, shows that while the specific instances Bieghler now cites were not mentioned or reviewed as part of his prosecutorial misconduct claim, they were mentioned by appellate counsel as part of the ineffective assistance of trial counsel claim. (*See* P.C.R. at 4618, Br. at 58–59, 102–104.) This was appropriate because trial counsel did not object to this line of questioning and thus did not preserve the issue for direct appellate review (unlike the instances appellate counsel *did* discuss under the prosecutorial misconduct claim, which *were* properly preserved by objection at trial).

**(d) Trial Counsel Conflict of Interest.** Bieghler claims his lawyer inadequately argued that trial counsel Charles Scruggs had a conflict of interest from previously representing State's witness Bobby Nutt.[7] We extensively reviewed this issue in our previous opinion. *Bieghler,* 481 N.E.2d at 98–99. Bieghler made a knowing and intelligent waiver of any potential conflict in open court after reviewing, and being questioned on, the facts pertinent to Scruggs's previous representation of Nutt, including the plea agreement.[8] (T.R. at 549–55); *Bieghler,* 481

---

6. Bieghler's appellate brief for his direct appeal was filed with this Court on June 22, 1984.

7. Bobby Nutt was arrested on November 17, 1981, for possession of marijuana and maintaining a common nuisance, and Scruggs represented him. Scruggs negotiated a plea agreement in which Nutt was given probation in exchange for his testimony against Bieghler.

8. The following colloquy transpired at the hearing on this issue:

[Direct examination]
Q Are you willing to waive any possible conflict there might be and waive any objections to Mr. Scruggs assisting me in trying this case?
A Yes.
Q And ... in so doing you understand that if you waive this at this time that you can't ever bring that up on appeal at a later date?
A Yes, sir.
Q You're willing to do that?
A Yes, sir.
. . . .
[Cross examination]
Q You understand that there was a plea agreement recommendation submitted to Mr. Scruggs on Mr. Nutt's behalf which called for, as part of the agreement, for Mr. Nutt to testify in this cause against you?
A I guess. I understand that, yes. I don't have any objections for Mr. Scruggs being my attorney, put it that away.
Q None whatsoever?

N.E.2d at 98. The only prejudice Bieghler claims is that the alleged conflict prevented Scruggs from presenting Nutt's plea agreement to the jury while cross-examining Nutt. However, the prosecutor elicited detailed testimony from Nutt concerning the plea agreement during the State's direct examination of him. (T.R. at 2393–95.) This is not the stuff of·deficient performance.

*(e) Trial Counsel's Performance.* Specifically, Bieghler claims that although appellate counsel raised this issue and discussed seven separate instances in support of it, appellate counsel did not argue some of them well, and there were other examples appellate counsel should have raised and argued.

■ For example, Bieghler says Scruggs should have objected to testimony concerning Bieghler's character and prior bad acts. Appellate counsel did allude to two types of "prior bad act" evidence elicited by the prosecutor to which trial counsel failed to object: evidence about Bieghler's drug-dealing business, and evidence of Bieghler's drug-using lifestyle. While appellate counsel forcefully argued that the prosecution's impermissible use of this evidence throughout the entire trial significantly prejudiced Bieghler, he did not provide examples from or citation to the record in support of this claim. (*See* P.C.R. at 4618, Br. at 58–59, 102–105.) The State's brief, in addressing this allegation, focussed on the prosecution's admission of evidence pertaining to Bieghler's drug-dealing business and correctly argued that such information was admissible as pertaining to motive, and trial counsel was thus not ineffective for failing to object to its admission or argue for its limitation.

■ The other line of prosecutorial questions on Bieghler's drug-using lifestyle was not addressed by the State as part of its IAC rebuttal. Likewise, our opinion only addresses this claim of ineffectiveness in terms of evidence admitted to show Bieghler's drug-dealing business and ·related activities, and does not mention the admission of evidence about Bieghler's drug-using lifestyle and habits. *See Bieghler,* 481 N.E.2d at 97.

The prosecution questioned a number of witnesses about their personal experience with taking different types of drugs, the effects the different drugs had on them, with taking drugs with Bieghler, and the observed effects drugs had on him, (Nutt, *see* T.R. at 2354, 2356, 2358–60, 2387; Brook, *see* T.R. at 2679–85, 2729–2731). After laying this foundation regarding Bieghler's drug habit and the effects that the drugs normally had on Bieghler prior to December 10, 1981, the prosecutor asked Scotty Brook about the events of December 10th. Much of this inquiry centered around when, what type, and how many drugs the two consumed that entire day. (*See* T.R. at 2371, 2733–37.) The prosecution's questioning of Bieghler followed much the same pattern. (*See* T.R. at 3052, 3083–86.)

This testimony was elicited in an attempt to establish Bieghler's probable state of mind on the night of the murder, as exemplified by its use in the State's closing argument. For instance, Bieghler admitted smoking marijuana and drinking around fifteen beers the afternoon of the murders, (T.R. at 3020–3024), and the prosecutor argued, "Bobby Nutt said that he'd seen Marvin Bieghler mix alcohol and marijuana and he said when he did that Marvin Bieghler was wild-like and obnoxious," (T.R. at 3132–33). Addressing the defense argument that Bieghler could not have driven fast on the slick, icy roads, the prosecutor argued,

They were drunk. They were high all day. They were drinking all night. They were taking pills. They were intoxicated.... How many times have you been driving down the highway on an icy road and have some idiot whiz by you like you were standing still? Ice doesn't stop everybody from driving fast. It stops people that have any sense about them from driving fast. Think it would stop a drunk? An intoxicated high person? Total disregard for everything, I would say, the state of his mind that night, the Defendant.

(T.R. at 553–54.)

A No. And I won't bring it up later, to put it in layman terms. I just want to get this show on the road.

(T.R. at 3152–53.) Finally, as to what might have finally pushed Bieghler into committing the murders, the State argued,

> Do you remember what Scotty Brook said right before they left the Tavern, Dusty's? He said something that went like this, "I'm tired of hearing about it. If you're going to do something, do it, or quit talking about it." This is at a time when this man's got fifteen plus beers, he's high on marijuana, he's taking speed and some other pills we don't know about. I suggest he was mad, said, "All right. I'll show you. I can do it. Let's get in the car. Come on." And in a rage he drove out there and did it.

(T.R. at 3218.) Bieghler's drug use and the effect it potentially had on him the night of the murders was central to understanding his state of mind at that time and explaining some of his alleged actions. Thus, the evidence was relevant, and its relevance was not outweighed by the potential unfair prejudice it engendered against Bieghler. In fact, both the State and the defense found this evidence useful. Much of Bieghler's testimony about his personal drug use was elicited by his trial counsel. (*See* T.R. at 3003–04, 3021, 3024.) Then, in his closing argument, defense counsel argued that Bieghler could not have committed the murders because of his intoxicated state:

> Scotty says that they left on the county road and drove straight across 22 at sixty miles per hour and the evidence is there was ice everywhere. Marvin's had fifteen to seventeen beers.... How do you explain the fact that they drove from Galveston to Dusty's Tavern to the scene of this crime in twenty minutes in the intoxicated condition that the defendant was in without crashing, when Scott Pitcher crashed at twenty miles an hour. Same roads.

(T.R. at 3181, 3183.) He also argued that Bieghler's intoxicated state would have impaired his shooting ability: "Nine shots were fired and every one of them found their mark. In a dark trailer? By someone as drunk as he's supposed to have been?" (T.R. at 3189.) Thus, both sides saw the relevance of this evidence as it pertained to their versions of the case. Given this, and trial coun-

sel's strategy of complete candor, it was not unreasonable for trial counsel to let it come in, and appellate counsel should not be faulted for failing to cite this evidence in support of his ineffectiveness claim.

■ On the other hand, we see a colorable argument regarding some of the State's questioning of Bieghler, of his girlfriend's daughter, Theresa McVety, and the State's use of this evidence in its closing argument. The evidence suggested that Bieghler was pretty casual about marijuana use by teenagers, including Theresa's.

By its own admission, the State was trying to show Bieghler's disregard for the law as it pertained to kids and marijuana, an issue with no relevance to proving whether he murdered the Millers. The State was clearly attempting to use Bieghler's prior bad acts to paint him as an immoral miscreant exceedingly different from the jurors, a pariah that should be eliminated from the jurors' community for being "unworthy of membership [in] the human race," (P.C.R. at 4618, Appellant's Br. at 103).

■ While appellate counsel should have cited these quotations in his brief when arguing trial counsel's ineffectiveness for failing to object, we cannot say our decision about the effectiveness of trial counsel would clearly have been different had he done so. Overall, trial counsel's representation of Bieghler was reasonably good. He poked persuasively at the greatest holes in the State's case, that of the time frame in which these events were to have occurred, (*see* T.R. at 3177–83, 3214–15), and the credibility of the State's key witness, Scotty Brook, (*see* T.R. at 3174–77, 3181–92, 3200–03, 3207–10). While his failing to object in this instance was a poor decision, isolated mistakes and instances of bad judgment do not necessarily render representation ineffective. *Hunter v. State*, 578 N.E.2d 353, 356 (Ind.1991). Considering the vastness of the evidence presented to the jury, we cannot conclude that these few instances so prejudiced Bieghler as to undermine our confidence in the trial's outcome.

■ Finally, Bieghler advances many arguments about trial counsel performance which appellate counsel could not have dis-

cerned from the face of the record, such as trial counsel's failure to find and introduce the testimony of an alibi witness,[9] his failure to consider and argue Bieghler's alleged Post–Traumatic Stress Disorder,[10] and his failure to offer additional mitigation evidence. Given appellate counsel's overall level of performance, these are not grounds for reversal.

### 2. Claims Raised but Earlier Deemed Waived

■ In his brief Bieghler makes a general argument for appellate counsel's deficient performance, citing the fact that "[t]his court commented on [appellate counsel's] inadequate briefing throughout the opinion and found three of the nine issues waived." (Appellant's Br. at 15 n. 4.) The specific issues to which Bieghler alludes concern appellate counsel's claims regarding the granting of the State's motion *in limine, Bieghler,* 481 N.E.2d at 92, Bieghler's extradition from Florida, *id.* at 93, and the admission of certain exhibits and evidence by the State, *id.* at 89. Bieghler does not provide any analysis or argument concerning the merits of these claims. Without showing a reasonable prob-

ability that, but for counsel's unprofessional presentation, the outcome of his appeal would have been different, we are unable to find any prejudice, and thus unable to find appellate counsel ineffective.

### 3. Claims Not Raised on Direct Appeal

Finally, Bieghler claims appellate counsel was ineffective for failing to raise the issues set forth in the remainder of his post-conviction brief. We address those allegations below. *See infra* parts III—V. Because we find none of them availing, Bieghler was not prejudiced by appellate counsel's failure to present them, and thus appellate counsel was not ineffective.

## II. Ineffective Assistance of Trial Counsel

■ Bieghler makes five arguments in support of the single claim that his trial counsel was ineffective. Some of these are new arguments about aspects of trial counsel's performance we considered on direct appeal; others focus on aspects not mentioned earlier. In either case, the earlier ruling that trial counsel was not ineffective is

---

9. The alibi witness Bieghler claims his counsel should have discovered was a woman named Lynn McGaha, who was a coworker of Bieghler's girlfriend, Thelma McVety. McGaha testified at Bieghler's post-conviction hearing that she saw Bieghler and Scotty Brook at her workplace at approximately 10:35 on the night the Millers were murdered and that Bieghler was intoxicated at the time. Bieghler argues that trial counsel performed deficiently by failing to investigate McVety's coworkers and that he was prejudiced because McGaha's testimony was further evidence that he could not have been present in the Miller trailer when the State alleged he was there.

Despite a thorough investigation of McGaha's workplace by police and FBI, (P.C.R. at 5141 (Testimony of McGaha)), McGaha did not come forward with the information she had. Hence, there was no police report or witness statement for Bieghler's trial attorney to consider when deciding how to allocate his resources in trial preparation or in witness selection. When questioned at the post-conviction hearing regarding statements of potential witness taken by the police, Bieghler's trial attorney testified that he "read everything that was there." (P.C.R. at 5478–79.) Trial counsel interviewed all potential witnesses he concluded were "relevant or critical." (P.C.R. at 5478.) Bieghler argues that his attorney failed to investigate McVety's work-

place, but he fails to show what more his attorney should have done to unearth the potential witness who admittedly withheld her information in full view of an official investigation. Bieghler thus fails to show unerringly and unmistakably that his attorney was deficient in the preparation of his defense.

10. Trial counsel may not have fully understood PTSD, but he was not unaware of it. (*See* P.C.R. at 5488.) His decision not to put on PTSD evidence was appropriate because his client then—and now—maintains his innocence. Had Bieghler taken the approach of "I didn't do it—but, if you think I did, it was because I suffer Post–Traumatic Stress Disorder," his defense would have been neither logical nor sympathetic. Indeed, such a defense most likely would have insulted the jury that had just concluded unanimously and beyond a reasonable doubt that Bieghler killed a man and his pregnant wife by shooting them nine times at point-blank range.

Nonetheless, at the penalty phase Bieghler's counsel presented some evidence of his good characteristics, (T.R. at 3279, 3283), and the effects of stress owing to his service in Vietnam. He adduced expert testimony that Vietnam-related stress often caused personality disorder and dysfunction. (T.R. at 3296–3304.) In light of this effort, it is not clear that counsel failed by omitting evidence of a particular disorder.

*res judicata.  Sawyer v. State,* 679 N.E.2d 1328 (Ind.1997).

### III.  Instructions on Accomplice Testimony

■ As we noted above, Bieghler says his appellate lawyer should have challenged trial counsel's failure to ask the court for a cautionary instruction concerning Scotty Brook's credibility as a witness.  A cautionary instruction is one that advises the jury to weigh cautiously the testimony of a State's witness who is suspected as an accomplice because an "accomplice is a corrupt and polluted source." *Commonwealth v. Fodero,* 273 Pa.Super. 278, 417 A.2d 648, 650 (1979).  Bieghler did not request a cautionary instruction, but claims now that he was entitled to one.  In this way, he claims his right to due process was violated because Brook exchanged his testimony against Bieghler for the prosecutor's promise that he would not charge Brook as an accessory in the Millers' murders.[11]

■ Indiana common law holds it improper to give an instruction concerning the credibility of a particular witness because doing so usurps the jury's function. *Turner v. State,* 258 Ind. 267, 273, 280 N.E.2d 621, 625 (1972).  In effect, Bieghler says his lawyers have been constitutionally ineffective for not asking us to change the rules.

Bieghler says jurors need the trial court's help to understand the personal interest an accomplice has in laying all the blame on the defendant during his testimony, especially if the accomplice has a plea bargain with the State.  The record amply demonstrates that vigorous cross-examination elicits more information than a court can give in a cautionary instruction.  Bieghler's trial counsel explored Scotty Brook's personal stake in his testimony by receiving affirmative answers to questions concerning whether he would be charged as an accessory, (T.R. at 2776), whether he faced prison time for a shotgun dealing conviction, (T.R. at 2770), and whether Brook's decision to give a detailed account to police was closely linked in time to his

shotgun dealing conviction, (T.R. at 2771).  Bieghler's counsel even managed to suggest that Brook was known in the community as "Snake," (T.R. at 2769–70), and he drove home the point that Brooks' stories had been inconsistent and may well have been produced by police suggestion, (T.R. at 2777–79).  The prosecutor himself asked Brook if he had a deal, and Brook testified that he had a conditional agreement "providing I didn't kill anyone." (T.R. at 2766.)  In sum, trial counsel took good advantage of the issue and appellate counsel need not have labored to push the idea that a cautionary instruction was necessary.

### IV.  Appellate Counsel and Other Jury Instructions

Bieghler faults his appellate lawyer for failing to make certain other challenges to jury instructions.

First, Bieghler argues that reading the whole statutory definition of murder allowed the jury to convict on a lesser intent of "knowingly" rather than "intentionally." (T.R. at 17–18.)  Bieghler confuses two different charging instruments.  There is no error in the guilt phase charge, which correctly charged murder.  Likewise, the death penalty charge clearly charged intentional killing and multiple murders.  (T.R. at 22.)  The information made clear the nature of the charges and the essential elements to be proven in order to recommend death on either of two aggravating factors.  (T.R. at 22.)

■ Second, Bieghler cites faulty circumstantial evidence instructions that he did not challenge in either the trial court or the post-conviction court.  He wants to argue this for the first time on an appeal from denial of post-conviction relief.  He may not.

Third, Bieghler contests an instruction about the jury's proper use of a witness's prior inconsistent statements.  At the time of Bieghler's trial, the *Patterson* rule permitted prior inconsistent statements of a testifying witness to be used as both substantive and impeachment evidence. *Patterson v. State,*

---

11.  Bieghler refers to Brook as an accomplice solely for the purpose of making his legal argument concerning the trial court's denial of his

request for a cautionary instruction.  In no way does he admit guilt for the two murders.

263 Ind. 55, 324 N.E.2d 482 (1975). Bieghler now asserts that the instruction incorrectly stated the law, referred only to guilt, and mistakenly used the word "substantial" rather than "substantive."

The instruction at issue stated:

> The credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement inconsistent with his testimony in this case. It is inconsistent if the witness denied making the prior statement if the witness could not remember making the prior statement. Evidence of this kind may be considered by you in deciding the weight to be given to the testimony or that witness as well as substantial evidence of the guilt of the Defendant.

(T.R. at 3243.) This is not an ideal instruction, but it does not support a claim of ineffective assistance of counsel. The first sentence explicitly—and properly—addresses witness credibility, as does the first part of the third sentence. The second sentence is not the clearest definition of an "inconsistent statement," but it is not improper. It explains that prior statements are inconsistent when the witness blows hot and cold.[12]

With respect to the second part of the third sentence, the concern is not that "substantial" is utilized instead of "substantive," for any improper weighting is mitigated by the instruction's references to credibility. Likewise, the reference to proving guilt is immaterial because proving guilt, of course, is the central issue in a criminal prosecution.

Fourth, Bieghler maintains he was subjected to a defective reasonable doubt instruction. He compares the instructions his jury was given to those given the juries in *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993), and *Cage v. Louisiana,* 498 U.S. 39, 111 S.Ct. 328, 112 L.Ed.2d 339 (1990), which "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was a 'moral certainty' that the defendant was guilty," *Cage,* 498

U.S. at 41, 111 S.Ct. at 329. The Supreme Court reasoned that the instructions suggested a higher degree of doubt than reasonable doubt and that proof to a moral certainty could be interpreted as less than the evidentiary certainty required by the Fifth Amendment. *Id.* at 41, 111 S.Ct. at 329.

The court instructed Bieghler's jury that reasonable doubt "is a fair, actual and logical doubt .... based upon reason and common sense, and arising from the state of the evidence," (T.R. at 3238–39), and that conflicts in the evidence should be resolved by giving Bieghler "the benefit of the doubt," (T.R. at 3245). It also instructed:

> To prove the defendant's guilt of the elements of the crime charged beyond a reasonable doubt, the evidence must be such that it would convince you of the truth of it, to such a degree of certainty that you would feel safe to act upon such conviction, without hesitation, in a matter of the highest concern and importance to you.

(T.R. at 734.) The court also said that a conviction is not to be based "on mere suspicion or conjecture." (T.R. at 3240.) These instructions do not approximate the faulty instructions given in *Cage;* they do comport with *Bell v. State,* 610 N.E.2d 229 (Ind.1993).

Fifth, Bieghler complains the trial court failed to instruct on the elements of burglary during the penalty phase. This argument is specious. The jury was instructed on the elements of burglary during the guilt phase, and the jury found Bieghler guilty of burglary. Thus, the court was not required to give the jury the same instruction again at the penalty-phase.

Sixth, Bieghler urges that the jury was unable properly to consider the mitigating evidence or to properly weigh the evidence because "the concept of 'mitigation'" was not explained. Incredibly, he bases this argument on the catch-all mitigator, which allows a jury to consider "any other circumstances appropriate," and an instruction on the presumption of innocence. He says that giving the jury freedom to consider any evi-

---

**12.** The instruction is correct in assuming a proper foundation was laid for the witness's prior statement. Of course, whether or not a proper foundation is laid for the introduction of prior inconsistent statement is an evidentiary issue, not a jury issue.

dence favoring the defendant "let the jurors define mitigating circumstances as they saw fit." (Appellant's Br. at 95.) There is no error here.

■ Finally, Bieghler argues that the jury was prevented from fully considering mitigating evidence by an instruction not to consider sympathy or prejudice "for or against the victims or the defendant." The same instruction was approved in *Woods v. State*, 547 N.E.2d 772, 783 (Ind.1989).

In sum, none of Bieghler's arguments support his claim that his appellate lawyer was ineffective.

## V. Improper Jury Selection and Jury Misconduct

Bieghler claims he was tried by a prejudiced jury and thus denied a fair trial. His claim is supported by a menu of arguments: some jurors were predisposed to vote for the death penalty; alternate jurors were present for deliberations; and a juror read the Bible during sequestration. In the main, these are points that bear on the performance of appellate counsel.

Bieghler identifies six jurors as so predisposed to the death penalty that they could not follow the law or fairly weigh the evidence. Our review of *voir dire* and those jurors' depositions, taken some nine years after Bieghler's trial, fails to expose any error in jury selection.

■ Bieghler argues that the presence of the alternate jurors in the room while the twelve jurors deliberated deprived him of a fair trial. The evidence before the post-conviction court did not show that was the case.

■ Finally, the claim that the jury was tainted by a juror's "consultation" of the Bible does not stand on fact as revealed by the record. Juror Smith gave a deposition nearly a decade after Bieghler's trial. She testified in a confused manner that failed to prove a Bible was present in the jury room or courtroom.[13] Her testimony is consistent, though, that the Bible was not consulted as an extra-legal source of authority during de-

liberations. She was consistent, too, in stating that the jurors' discussion about the biblical propriety of the death penalty occurred about the time of the deliberations on guilt and not during the penalty-phase. (P.C.R. at 5088.) As the post-conviction court noted, Smith's testimony establishes that "conscientious people who are faced with a life and death decision resort to their religious scruples in making such decision." (P.C.R. at 3267.) Such deep introspection neither violates principles of justice nor prejudices the defendant. We see neither ineffective appellate representation nor any other grounds for relief here.

## VI. Penalty Phase Cumulative Error

Bieghler says his death sentence violates due process because of unreliability owing to "individual and accumulated errors" during the penalty-phase of his trial. For example, he claims the trial judge erred by praying with the jurors after trial, though the record does not so demonstrate. He claims the pre-sentence report was improper because it included both the official version of the offense and Bieghler's version. He claims the trial court should have found him to have no prior record of criminal activity, though Bieghler was plainly a regular drug dealer. And so on. These claims are precluded from relitigation in this appeal, for they were available on direct appeal and merely are new arguments on old facts. *Sawyer v. State*, 679 N.E.2d 1328, 1329 (Ind.1997); *Weatherford v. State*, 619 N.E.2d 915, 917 (Ind.1993). We will not detail each of them further here merely because they are wrapped in a sweeping due process claim.

## VII. Constitutional Challenge to Capital Sentencing Statute

Bieghler claims that Indiana's death penalty statute, Indiana Code § 35–50–2–9, unconstitutionally allows too much prosecutorial discretion in charging the death penalty, does not meaningfully channel judge and jury discretion, and does not afford meaningful appellate review. Bieghler concedes these arguments have been rejected. *Harrison v.*

---

**13.** The record shows that some deliberations were conducted in the courtroom itself, rather than the jury room. No one other than the jurors or the alternates were present.

*State,* 644 N.E.2d 1243 (Ind.1995); *Bivins v. State,* 642 N.E.2d 928 (Ind.1994); *Fleenor v. State,* 514 N.E.2d 80 (Ind.1987), *cert. denied,* 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988). He states that he raises them only to preserve them for *habeas corpus.* He has done so.

### Conclusion

Thorough post-conviction review of the proceedings leading to Marvin Bieghler's conviction and sentence reveals no constitutional error by the trial court or in the performance of counsel either at trial or in his direct appeal. In addition, no reversible error has been found in the proceedings of the post-conviction court. The conviction and sentence of death are affirmed.

DICKSON, SULLIVAN, SELBY and BOEHM, JJ., concur.