**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

APPELLANT PRO SE:

**KEVIN SMITH**
Michigan City, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**J.T. WHITEHEAD**
Deputy Attorney General
Indianapolis, Indiana



FILED

Feb 22 2013, 9:19 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| KEVIN SMITH, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 45A04-1205-PC-264 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE LAKE SUPERIOR COURT
The Honorable Salvador Vasquez, Judge
Cause No. 45G01-0803-PC-5

**February 22, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Kevin E. Smith, pro se, appeals the denial of his petition for post-conviction relief, in which he challenged his convictions for class A felony rape, class A felony criminal deviate conduct, class B felony criminal confinement, and class C felony sexual battery. On appeal, he presents the following consolidated and restated issues for review:

1.      Did Smith establish ineffective assistance of trial counsel?

2.      Did Smith establish ineffective assistance of appellate counsel?

We affirm.

The facts underlying Smith's offenses were set out in detail by this court in his direct appeal. *See* Cause No. 45A03-0608-CR-360 (June 22, 2007), *trans. denied*. In addition to summarizing those facts, we now also provide additional facts relevant to the issues raised on post-conviction relief.[1]

Shortly before 1:00 in the afternoon on August 15, 2005, eighteen-year-old M.S. was walking past Smith's home on her way to a friend's house. Smith, a thirty-two-year-old whom M.S. had met on several past occasions, was on the front porch of his home and spoke to M.S. He indicated that his girlfriend could give her a ride, as she had on prior occasions, if she came inside the house and waited. M.S. agreed and entered the home.

Once inside the home, Smith approached M.S. and asked her if she wanted to have sex. When M.S. declined and tried to exit, Smith held a knife to her throat and told her to cooperate. Smith forced her into his bedroom and threw her onto the bed. He climbed on top

---

[1]   Smith's statement of facts section of his appellate brief is comprised almost entirely of "facts" taken from his own self-serving affidavits, which were not admitted into evidence at the post-conviction hearing. This is improper, and these alleged facts will not be considered on appeal.

of her and began to choke her when she struggled. Smith forced M.S. to perform fellatio on him for ten to fifteen minutes. He then removed her pants and tampon and had intercourse with her for about five or ten more minutes.

After stopping, Smith forced M.S. into the shower and instructed her to thoroughly clean herself. He provided her with a new tampon and then took her back into his bedroom and allowed her to dress. Smith ordered M.S. to lie on her stomach on the bed and then he bound her hands and feet together with rope behind her back. When M.S. asked what he was planning to do with her, Smith replied that he did not know yet. He held a cigarette for M.S. to smoke and talked to her for a brief period of time. He then lifted her to the floor between the bed and the wall and tied her to the bed frame. He also placed duct tape over her mouth, indicating that he was going to leave to get money and a vehicle.

Smith left the house, but returned within five minutes. At that time, M.S. heard the voice of Smith's seven-year-old son. When she tried to yell, Smith choked her again. Smith then left the residence with his son. At some point, M.S. was able to loosen the ties binding her feet and free herself from the bed. M.S. exited the house shortly before 4:00, with her wrists still bound, and frantically flagged down Jon Metz, a passing motorist. When Metz stopped, M.S. entered the passenger side of his vehicle and asked for help, indicating that she had been raped. M.S., who was carrying a bundle of rope and still bound, was hysterical, shaking, and crying. Metz pulled into a driveway a few houses down from Smith's and called 911. While Metz was making the call, a truck sped into the driveway at Smith's residence. M.S. cowered in her seat and pointed out the truck to Metz. Metz immediately

3

drove away and took M.S. to a nearby business to meet police. A rape examination was later performed on M.S., and Smith's DNA was present in vaginal samples taken from her. Visible injuries to M.S.'s wrists, ankles, and neck were also documented.

On August 16, 2005, the State charged Smith with class A felony rape, class B felony criminal deviate conduct, class B felony criminal confinement, class C felony sexual battery, and class D felony criminal confinement. Smith left the state with his son following the incident. He returned and surrendered to police on August 23. A jury trial was held between May 22 and May 26, 2006. Smith testified on his own behalf and indicated that he had known M.S. before the alleged rape and that they had had seven to nine consensual sexual encounters between January and August 2005. He testified that on the day in question he had consensual intercourse with M.S. sometime before 1:00. According to Smith, his condom broke during sex and they both became scared that she might get pregnant. Thereafter, M.S. asked for Oxycontin and left angry when Smith refused to give her a pill without money. Smith testified that M.S. left around 1:00 and that he left around 1:30 to pick up his son, run errands, and stop at two different residences. Shortly after being warned that police came by his house around 4:30, Smith fled to Virginia with his son.

The jury found Smith guilty as charged, and the trial court entered convictions on all but the class D felony. Smith received an aggregate sentence of fifty-eight years in prison. His convictions were affirmed on direct appeal.[2] Our Supreme Court denied transfer on

---

[2] On direct appeal, Smith argued that the trial court committed reversible error when it took judicial notice of the fact that Smith had violated a pretrial order by not filing a notice of consent defense. We concluded that any error in this regard was harmless.

4

September 28, 2007. Smith was represented at trial by attorney John Cantrell and on direct appeal by attorney Charles Stewart.

Smith filed a pro se petition for post-conviction relief on March 19, 2008, which he amended on January 30, 2009 and April 27, 2009. Hearings on the PCR petition were held on May 10 and June 7, 2011. At the hearing, Smith presented testimony from, inter alia, attorney Cantrell and various potential alibi witnesses, whom Cantrell did not call as witnesses at Smith's jury trial. The post-conviction court denied Smith relief on March 10, 2012. Smith now appeals. Additional facts will be provided below as needed.

Defendants who have exhausted the direct appeal process may challenge the correctness of their convictions by filing a post-conviction petition. Ind. Post-Conviction Rule 1(1). Post-conviction proceedings, however, do not afford a petitioner with a super-appeal. *Timberlake v. State*, 753 N.E.2d 591 (Ind. 2001). In a post-conviction proceeding, the petitioner must establish the grounds for relief by a preponderance of the evidence. P-C.R. 1(5); *Wesley v. State*, 788 N.E.2d 1247 (Ind. 2003). When challenging the denial of post-conviction relief, the petitioner appeals a negative judgment, and in doing so faces a rigorous standard of review. *Wesley v. State*, 788 N.E.2d 1247. To prevail, the petitioner must convince this court that the evidence leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id*. We will disturb the post-conviction court's decision only where the evidence is without conflict and leads to but one conclusion and the post-conviction court reached the opposite conclusion. *Id*.

Here, the post-conviction court entered findings of fact and conclusions of law in accordance with Ind. Post-Conviction Rule 1(6). Although we do not defer to the post-conviction court's legal conclusions, "'[a] post-conviction court's findings and judgment will be reversed only upon a showing of clear error—that which leaves us with a definite and firm conviction that a mistake has been made.'" *Overstreet v. State*, 877 N.E.2d 144, 151 (Ind. 2007) (quoting *Ben-Yisrayl v. State*, 729 N.E.2d 102, 106 (Ind. 2000) (citation omitted)).

1.

The bulk of Smith's post-conviction claims challenge the effectiveness of trial counsel. A claim of ineffective assistance of trial counsel requires a showing that: (1) counsel's performance was deficient by falling below an objective standard of reasonableness based on prevailing professional norms; and (2) counsel's performance prejudiced the defendant so much that "'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Davidson v. State*, 763 N.E.2d 441, 444 (Ind. 2002) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). *See also Taylor v. State*, 840 N.E.2d 324 (Ind. 2006) (the failure to satisfy either component will cause an ineffective assistance of counsel claim to fail). When an appellant brings an ineffective assistance of counsel claim based upon trial counsel's failure to file a motion or lodge an objection, the appellant must demonstrate that the trial court would have granted said motion or sustained said objection. *Wales v. State*, 768 N.E.2d 513 (Ind. Ct. App. 2002), *reh'g granted on other grounds*, 774 N.E.2d 116, *trans. denied*.

> Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption

arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. We recognize that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Smith v. State*, 765 N.E.2d 578, 585 (Ind. 2002) (citations omitted). Thus, we will not second-guess the propriety of trial counsel's tactics and will reverse only where the strategy is so deficient or unreasonable as to fall outside of the objective standard of reasonableness. *See Davidson v. State*, 763 N.E.2d 441.

Smith initially claims that trial counsel failed to do a thorough investigation. He contends that had counsel interviewed certain witnesses, counsel would have learned of a number of alibi witnesses and, moreover, that M.S. had a motive to falsely accuse him. To summarize, Smith admits that he had consensual sex with M.S. on the morning of the day in question, but he directs us to alibi witness testimony from the post-conviction hearing indicating that he had an alibi from 1:30 to after 3:00 that afternoon.[3] As for motive, Smith's theory is that M.S. set him up to help Smith's ex-girlfriend gain custody of their seven-year-old son. He also claims that another woman did the same thing for his ex-girlfriend during the summer of 2004, with rape charges eventually being dropped in that case because the complaining witness did not want to proceed.

---

[3] At the post-conviction hearing, Ruby Matuszczak testified that Smith came to her house, which was two houses down from Smith's, at 1:30 to pick up his son. He was there for at most five minutes. Smith's mother and step-father testified that Smith came to their home (about a twenty-minute drive from Smith's home) around 2:10 or 2:20 with their grandson. Smith stopped in briefly to see if someone had dropped off money for him. Several other witnesses testified that they met up with Smith around 3:00 at a friend's house. One of these individuals provided cash to Smith in exchange for Smith's social security check.

7

At the post-conviction hearing, attorney Cantrell testified that he was aware of Smith's proposed defense theories. Smith had provided counsel with a list of potential defense witnesses. Cantrell spoke with a number of these witnesses during his investigation and found them to either lack credibility[4] or not be helpful. Further, after a brief review of a custody file delivered by one of Smith's close friends, Cantrell determined that it was not relevant to the instant case. Cantrell also testified that he met with Smith three or four times in jail. Moreover, Cantrell took a lengthy deposition of M.S. about a month before trial and left "thinking that she was going to come off pretty credible to a jury." *Id*. at 195. After the deposition, Cantrell spoke with Smith about reconsidering his decision to plead not guilty.

Based upon his investigation and experience, Cantrell testified that he felt the best theory of defense was consent (especially in light of the fact M.S. used a tampon after the alleged rape) and that the alibi and conspiracy theories urged by Smith were, in Cantrell's opinion, not strategically appropriate. With respect to the alibi defense, in addition to noting the DNA evidence, he explained that the timeline of events described by M.S. was not as exact as Smith portrayed and that Smith could have committed the crimes against M.S. and then gone to the various locations in an attempt to establish an alibi.[5] In fact, counsel

---

[4] With respect to two individuals who were trying to provide Cantrell with information to help Smith, Cantrell testified, "I thought both of them were lying through their teeth." *Transcript Vol. 2 of 3* at 67.

[5] Based upon M.S.'s testimony, it is evident that the crimes were complete by about 1:30 in the afternoon. It is at this time that Smith's first alibi witness, his neighbor two doors down, indicated that he came to her house briefly to pick up his son. This corresponds with M.S.'s testimony that Smith left for about five minutes and upon his return she heard his son. After coming back into the bedroom and choking her, Smith eventually left again. M.S.'s testimony regarding when Smith left for the final time and how long it took her to free herself was not entirely clear. Certainly, Smith could have made other alibi stops during this time period.

testified that the suggested alibi defense seemed "pretty ridiculous." *Id*. at 129.

It is evident that trial counsel investigated the theories proposed by Smith and made a strategic decision to reject them. As set forth above, we will not second-guess counsel's strategy and tactics. *See Davidson v. State*, 763 N.E.2d 441. Moreover, we share counsel's belief that presenting an alibi defense and/or Smith's bizarre conspiracy theory, under the circumstances of this case, would have been ill advised. Smith has failed to show ineffectiveness in this regard.

On a similar note, Smith asserts that counsel was ineffective for failing to timely file the notice of alibi defense. Contrary to Smith's assertion, however, it is clear from the record that this is not the reason the alibi defense was not presented to the jury. As set forth above, counsel made a strategic decision (over his client's objection) not to present alibi witnesses.

Smith also claims that counsel was ineffective for failing to challenge for cause Juror 310, the ex-sister-in-law of one of Smith's past girlfriends. At the post-conviction hearing, Smith testified that he informed Cantrell during jury selection that he knew this prospective juror and that she "could possibly be biased." *Transcript Vol. 3 of 4* at 335. Cantrell testified, on the other hand, that although he did not specifically recall jury selection in Smith's case, "[i]f somebody told me that they knew somebody on the panel, I would have absolutely brought it up to the court's attention or done something with it, but I definitely would have remembered if he said that, yeah." *Transcript Vol. 2 of 3* at 162. In light of this conflicting testimony, Smith has failed to establish that the evidence on this issue leads unerringly and unmistakable to a finding of ineffective assistance. *See Wesley v. State*, 788

9

N.E.2d 1247.

Smith complains that counsel failed to introduce medical evidence establishing that he had no STDs in October 2005. Specifically, Smith wanted the jury to be aware that M.S. had chlamydia on the day of the alleged rape but he did not a month or two later. The relevance of this proposed evidence escapes us, as it is undisputed that Smith had sexual intercourse with M.S. and his DNA was found inside her. Counsel was not ineffective in this regard.

We reject Smith general overarching claim that Cantrell provided him no legal representation at all. On the contrary, the record reveals that prior to trial counsel met with Smith several times, spoke with a number of potential defense witnesses, deposed the victim, and developed a strategy to defend Smith. Further, at trial, counsel filed a motion in limine, made lengthy opening and closing arguments, cross-examined witnesses, asserted many successful objections on Smith's behalf, moved for a directed verdict on three separate grounds, and actively defended Smith during the five-day trial. The fact that the jury asked a number of questions during trial or that Smith did not agree with the defense strategy employed by counsel does not equate to a lack of representation.

Finally, with respect to trial counsel, we observe that Smith makes a number of other undeveloped claims, or as he often puts it "examples", of ineffectiveness. He fails to support these remaining claims with cogent argument. For example, Smith baldly asserts that counsel "failed to advocate Smith's right to a fair sentencing procedure, and failed to object to improper aggravators and the unreasonable sentence in this case." *Appellant's Brief* at 39. He provides no relevant authority in support of these claims. Moreover, what he

10

characterizes as "character assassination" (such as prior convictions, probation history, and flight) are valid considerations at sentencing.

Smith's claim that counsel failed to object to erroneous instructions and tender proper instructions is entirely unsupported. He did not present the post-conviction court with the specific instructions that he claims should have been given, did not elicit testimony from Cantrell regarding jury instructions, and does not establish that the instructions would have been given by the trial court if proffered by counsel.

Smith also generally claims that counsel should have objected to the admission of certain exhibits, evidence of prior bad acts, and statements by the prosecutor.[6] He does not go beyond merely listing these alleged examples of error. In particular, he does not establish that any of these objections would have been sustained or that counsel's failure to object affected the result of the proceeding. We find these claims waived.

In sum, Smith has failed to establish error with regard to the post-conviction court's denial of his claims of ineffective assistance of trial counsel. The evidence against Smith was strong, and we agree with the State: "Smith's hindsight is misguided if he believes that evidence regarding sexually transmitted disease, or custody disputes, or an alibi for which the times were not even clear, would have prevailed." *Appellee's Brief* at 14.

---

[6]  Smith directs us to three statements made by the prosecutor during closing argument and claims that they constituted evidentiary harpoons. We fail to see how the statements in any way constituted evidence. Further, we observe that Smith did not raise this ineffectiveness claim before the post-conviction court, and trial counsel did, in fact, object (though not on grounds of "evidentiary harpoon") and move for a mistrial with respect to the first statement challenged by Smith.

11

2.

Smith next contends that appellate counsel rendered ineffective assistance. We review such a claim using the same standard applicable to claims of ineffective assistance of trial counsel. *See Ben-Yisrayl v. State*, 729 N.E.2d 102. The petitioner must show that appellate counsel was deficient in his performance and that the deficiency resulted in prejudice. *Id.* Ineffective assistance claims at the appellate level generally fall into three basic categories: 1) denial of access to an appeal; 2) failure to raise issues; and 3) failure to present issues well. *Fisher v. State*, 810 N.E.2d 674 (Ind. 2004). Smith's claims fall into the second and third categories.

Initially, Smith asserts that counsel failed to prepare a meaningful appellate brief. Though not entirely clear, we take this to mean counsel did not present the sole issue raised on direct appeal well. Smith, however, has not established that he was prejudiced by the quality of the appellate argument advanced by counsel. To be sure, on direct appeal, we held that even assuming the trial court's actions were erroneous, any error was harmless. Smith has not established otherwise.

Smith also argues that appellate counsel was ineffective for failing to "raise prosecutor misconduct as clear violations of the Motion in Limine which denied Appellant a fair trial and fundamental due process guaranteed by the Indiana and United States Constitutions." *Appellant's Brief* at 44. His argument, though brief, is difficult to unravel. He complains about evidentiary harpoons, unsupported allegations of misconduct, and improper questions regarding prior bad acts.

Ineffectiveness is rarely found when the claim is based upon the failure to raise certain issues on appeal. *Bieghler v. State*, 690 N.E.2d 188 (Ind. 1997). This is because one of the most important strategic decisions to be made by appellate counsel is the decision of what issues to raise. *Id.* Thus, a petitioner "must overcome the strongest presumption of adequate assistance." *Law v. State*, 797 N.E.2d 1157, 1162 (Ind. Ct. App. 2003). In evaluating the performance of counsel in this context, we look to whether the unraised issues are significant and obvious from the face of the record and whether the unraised issues are clearly stronger than the raised issues. *Henley v. State*, 881 N.E.2d 639 (Ind. 2008). If this analysis demonstrates deficient performance, we then look to whether the issues that counsel failed to raise would have been clearly more likely to result in reversal or an order for a new trial. *Id.*

Smith has entirely failed to establish this claim of ineffectiveness. He does not support his prosecutorial misconduct argument with any authority or analysis and makes no showing that this issue would have been stronger than the one presented on direct appeal. Smith has not established that this issue, if raised, would have had any likelihood of resulting in reversal or a new trial. Thus, the trial court did not error in denying relief based upon Smith's unsupported ineffective assistance of appellate counsel claim.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.