Isaac HOOKER, Appellant–Petitioner,

v.

STATE of Indiana, Appellee–Respondent.

No. 82A01–0304–PC–128.

Court of Appeals of Indiana.

Dec. 5, 2003.

Transfer Denied Feb. 19, 2004.

Susan K. Carpenter, Public Defender of Indiana, Victoria Christ, Deputy Public Defender, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

## STATEMENT OF THE CASE

Isaac Hooker appeals the post-conviction court's denial of his Petition for Post–Conviction Relief. The parties raise the following issues for review:

1. Whether Hooker's freestanding claims regarding (a) the State's motion to withdraw the parties' oral plea agreement in 1988, and (b) his 1991 re-sentencing, are available for post-conviction review.

2. Whether the post-conviction court erred when it concluded that Hooker's appellate counsel and counsel at his 1991 re-sentencing were not ineffective.

3. Whether the attempted murder and accomplice liability jury instructions given at Hooker's trial constitute fundamental error.

We affirm.

## FACTS AND PROCEDURAL HISTORY

We stated the relevant facts in our 1990 memorandum decision as follows:

During the early morning hours of July 29, 1988, William Shepard (Shepard) discovered an intruder who had entered Shepard's Apollo Liquor Store (store) through a hole in the roof. During the encounter, Shepard suffered a gunshot wound to the left side of his chest and blunt trauma to his head which caused him to forget details of the encounter, including the identity of the intruder. Police investigators discovered money and cigarettes had been taken from the store.

During the early hours of the same day, Hooker reported to the hospital, using a fictitious name, to seek treatment for a gunshot wound. Officer Hubbard and Detective Kelly, [who were] at the hospital to look into the circumstances surrounding Hooker's injury, decided to take [Hooker] to the police station to investigate the matter further. At the station, swabs of Hooker's hands were taken and his clothes were removed. Later that day, Hooker was arrested and charged with Burglary of the store and Robbery of and Attempted Murder of Shepard.[1]

*Hooker v. State*, No. 82A01–8909–CR–362, slip op. at 2, 554 N.E.2d 839 (Ind.Ct.App. May, 14, 1990).

On November 28, 1988, the day of trial, the State and Hooker, by counsel, informed the trial court that the parties had reached a plea agreement. Because the parties had not reduced the agreement to writing, defense counsel recited the terms of the agreement on the record. Specifi-

1. Specifically, the State charged Hooker with Attempted Murder, Burglary, and Robbery, all as Class A felonies.

cally, the following colloquy occurred at the guilty plea hearing:

> DEFENSE COUNSEL: Your Honor. My understanding of the agreement is as follows: Mr. Hooker stands charged with three Counts, one Count of attempted murder, one Count of robbery, as a Class A felony, another Count of burglary, as a Class A felony. In return for Mr. Hooker's plea of guilty to Counts II and III which is the robbery and the burglary, the State of Indiana is going to dismiss the attempted murder, Count I. [The State is] going to recommend an executed sentence of twenty years. Mr. Hooker is going to give a statement, testify truthfully and fully in the Cause of any other co-defendants excepting his brother, David Hooker. And any statements or testimony that Isaac is going to give in furtherance of this agreement will not be used against David. He also agrees to take a polygraph as . . .
>
> COURT: Used against David or used against him?
>
> DEFENSE COUNSEL: Used against David and, of course, not against him if this plea agreement doesn't pan out. At any rate what he says is not to be used against David and, of course, not against him if the plea agreement is not accepted.

The court then established a factual basis for Hooker's plea to burglary and robbery as an accomplice and advised Hooker of his constitutional rights. Following the advisement, the court stated in relevant part:

> So let the record show that the defendant now having been fully advised of his rights, submits a written acknowledgement thereof, which is made a part of the record herein . . . and the Court having found a factual basis for Count II, robbery as a Class A felony, now enters judgment accordingly. The Court further having found a factual basis for Count II, burglary, as a Class A felony, enters judgment accordingly. A pre-sentence investigation is ordered and sentencing is set for, how about December 18?

Immediately thereafter, Hooker gave a recorded statement in the presence of his counsel and the prosecutor in which he admitted his involvement in the crimes but stated that his brother David was not involved. On December 15, 1988, Hooker took a polygraph examination, the results of which were inconclusive. The State then obtained statements from other individuals which suggested that David had been involved in the crimes.

On December 19, 1988, the State moved to withdraw its offer that was previously presented to the court at the November 28 hearing. Hooker objected to the State's motion, and the trial court set the matter for a hearing and also vacated Hooker's sentencing date. Hooker then filed a motion to compel "consummation" of the plea agreement. At the hearing on the parties' opposing motions, the State argued that Hooker had failed to comply with the terms of the parties' agreement because the results of the polygraph examination indicated that he had lied about his brother's involvement in the crimes. Hooker responded that, according to the terms of the agreement, he was not required to pass the polygraph, only to submit to one, and that he had done all that was required of him under the agreement. Hooker further argued that he had relied to his detriment on the agreement and, thus, that the court should hold the State to the agreement. On January 10, 1989, the court issued its Order granting the State's motion to withdraw its offer and denying Hooker's motion to consummate the agreement, which provided in part:

## FINDINGS OF FACT

1. The defendant was charged herein in a three count information, all counts being Class A felonies, the first, Attempted Murder, second, Robbery and the third, Burglary.

2. On November 28, 1988, with a jury waiting outside the Courtroom and outside the presence of the jury, and by leave of Court, the defendant withdrew his former plea of not guilty and entered a plea of guilty to the second and third counts pursuant to a sentencing recommendation read into the record. The Court did advise the defendant of his constitutional rights and the Court further found a factual basis for the defendant's plea. The Court found the defendant guilty of Count II, Robbery, as a Class A felony, and Count II, Burglary, as a Class A felony.

3. The defendant, during the advisement of his rights, recognized that part of the plea agreement required him to give a statement, testifying truthfully and fully in the cause of any other co-defendant, except for his brother, David Hooker, and it was further agreed that any such statement would not be used against his brother, David, nor against the defendant himself. The defendant further agreed to take a polygraph examination. The State did further agree to dismiss the attempted murder count and recommended that the defendant be sentenced to a total of twenty years. A copy of that part of the advisement referred to was admitted as Defendant's A.

The court further found that Hooker had given a statement following the November 1988 hearing and subsequently took a polygraph examination, the results of which were inconclusive. The court noted inconsistencies in Hooker's statements and the statements of other witnesses and determined that Hooker's statement "is indicative of not being fully truthful as required by the plea agreement." The court concluded "[t]hat the defendant, as part of the plea agreement entered into on November 28, 1988, was to testify truthfully and fully in this cause and that he has failed to do so." Accordingly, the court granted the State's motion to withdraw its offer and denied Hooker's motion to compel. Hooker's counsel then filed a motion asking the court to certify its order for interlocutory appeal, but the court denied his motion.

In April 1989, Hooker was tried by jury. Shepard testified at trial but could not recall details of the crime. He stated that he remembered seeing one intruder in the store, and he ordered that intruder to lie down on the floor.[2] He also remembered that the intruder called to "one of his buddies." But Shepard could not identify Hooker as one of the intruders on the night in question.

Jerry Marsh testified pursuant to a plea agreement. While he denied involvement in the crimes, he stated that he helped David dispose of a rifle the night Hooker had been shot and that he gave false statements to police. Marsh implicated David as being involved in the crimes at the store. Although a footprint recovered from the scene matched a pair of Marsh's shoes, Marsh stated that David was wearing his shoes that night. Police recovered the rifle that Marsh and David had attempted to hide and recovered dried blood from the stock that matched Marsh and Shepard, but not Hooker.

---

2. The evidence shows that Shepard had a .38 caliber revolver at the store.

Hooker, whose apartment was located above the store, testified that he saw that Shepard had been injured and entered through the roof to aid him. He stated further that Shepard shot him as Hooker attempted to assist him. David took Hooker to the hospital, where Hooker gave a false name and address. Hooker had gunshot residue on the back of his hand and on his shirt, and blood removed from the cash register inside the store was similar to Hooker's. Hooker had been shot at close range, and the bullet which struck him had entered at a downward angle. Police recovered a .38 caliber revolver with rounds, two of which were spent, from the store. Again, Shepard testified that he had owned a .38 caliber handgun that he kept at the store.

The trial court gave the following jury instruction on attempted murder:

### COURT'S INSTRUCTION NO. 12

The Information in Count I charges the defendant with the crime of Attempted Murder.

Murder is defined by statute as follows:

A person who knowingly kills another human being commits murder, a felony.

Attempt is defined by statute as follows:

A person attempts to commit a crime when, acting with the culpability required for commission of the crime, he engages in conduct that constitutes a substantial step toward commission of the crime. An attempt to commit a crime is a felony of the same class as the crime attempted. However, an attempt to commit murder is a Class A felony.

To convict the defendant, the State must have proved each of the following elements: The defendant 1. knowingly 2. on or about July 29, 1988, engaged in conduct, to-wit: BY KNOWINGLY SHOOTING AT AND AGAINST THE BODY OF THE SAID WILLIAM B. SHEPARD WITH A CERTAIN HANDGUN LOADED WITH GUNPOWDER AND METAL BULLETS, CAUSING ONE (1) OF SAID METAL BULLETS TO STRIKE THE SAID WILLIAM B. SHEPARD AND BY KNOWINGLY STRIKING THE SAID WILLIAM B. SHEPARD WITH A CERTAIN BLUNT OBJECT 3. that the conduct was a substantial step toward the commission of the crime of murder.

If the State failed to prove each of these elements, you should find the defendant not guilty.

If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of the crime of Attempted Murder, a Class A felony as charged in the information.

The court instructed the jury further as follows:

### COURT'S INSTRUCTION NO. 15

The word "knowingly" as used with respect to the offense of Attempted Murder, as charged in the Information, is synonymous with the word "purposely." An act is done purposely, if it is willed, is the product of conscious design, intent or plan that is done, and is done with the awareness of the probable consequences.

### COURT'S INSTRUCTION NO. 16

Attempted Murder is a crime of specific intent, that is, the killing of another human being must be done with the intent to commit the crime.

The intent to commit a felony can be inferred from the time, force, and manner to the acts of the participants, if any.

You are instructed that where a specific intent must be proven, beyond a

reasonable doubt, as in Attempted Murder, to make an act an offense, the State is not required to make proof of specific intent by direct evidence, for purpose and intent are subjective facts. That is, they exist within the mind of the person, and since you cannot delve into a person's mind and determine his purpose and intent, you may look to all the surrounding circumstances, including what was said and done in relation thereto, if any evidence thereof. A determination of the defendant's intent may be arrived at by the jury from a consideration of the evidence, if any, of the defendant's conduct and the natural and usual sequence to which such evidence of said conduct, if any, logically and reasonably points.

Finally, the court instructed the jury on accomplice liability as follows:

### COURT'S INSTRUCTION NO. 30

A person may be charged as a principal and may be found guilty of the offense if he or she knowingly or intentionally aids, induces or causes another person to commit an offense even if the other person:

1. has not been prosecuted for the offense;

2. has not been convicted of the offense.

Hooker tendered, but the trial court refused, the following instruction on attempted murder:

### DEFENDANT'S INSTRUCTION NO. 3

Before you may find the defendant guilty of Attempted Murder as set out in Count I, you must find that the State has proven [the] evidence beyond a reasonable doubt each one of the following elements:

1. That the defendant intentionally, that is, with the specific intent to kill;

2. Engaged in conduct which constituted a substantial step toward killing William Shepard.

If you find that the State has failed to prove any one of these elements beyond a reasonable doubt, then you must find the defendant not guilty of Attempted Murder.

The jury found Hooker guilty as charged, and the trial court imposed a sentence of sixty years.

On direct appeal, Hooker's appellate counsel raised the following issues: (1) whether the trial court erred when it admitted certain evidence; (2) whether the evidence was sufficient to sustain Hooker's convictions; (3) whether the court erred when it instructed the jury on attempted murder; and (4) whether the court violated double jeopardy principles when it imposed sentence on the burglary and robbery convictions as Class A felonies. This court affirmed Hooker's convictions but agreed with Hooker that his sentence, as imposed, violated double jeopardy. *Hooker*, slip op. at 10–11. We therefore remanded for re-sentencing and instructed the trial court to impose sentence on the burglary and robbery convictions as Class C felonies, as opposed to Class A felonies. The trial court subsequently re-sentenced Hooker to the presumptive term for Class C felonies for a total term of thirty-five years. Hooker did not appeal that sentence.

On February 5, 1998, Hooker filed his pro se Petition for Post–Conviction Relief. Hooker amended his petition in September 2000 and raised the following issues: (1) whether his constitutional due process rights were violated when the trial court allowed the State to withdraw the parties' 1988 oral plea agreement; (2) whether the trial court improperly instructed the jury

on the specific intent requirement for attempted murder; (3) whether, in 1991 when he was re-sentenced, Hooker was entitled to the ameliorative effect of a change in the presumptive term for Class C felonies; and (4) whether he received ineffective assistance of appellate counsel and of counsel at his re-sentencing. The State filed its answer in February 2001. The post-conviction court conducted an evidentiary hearing that same month and took the matter under advisement. In February 2003, the court issued its Findings of Fact and Conclusions of Law denying Hooker post-conviction relief.[3] This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

■ The purpose of a petition for post-conviction relief is to raise issues unknown or unavailable to a defendant at the time of the original trial and appeal. *Benson v. State,* 780 N.E.2d 413, 418 (Ind.Ct.App.2002), *trans. denied.* " 'Thus, post-conviction relief is not a "super-appeal" which allows the rehashing of prior proceedings regardless of the circumstances surrounding them.' " *Id.* (quoting *Collier v. State,* 572 N.E.2d 1299, 1301 (Ind.Ct.App.1991), *trans. denied*). When the petitioner has already been afforded the benefit of a direct appeal, post-conviction relief contemplates a rather small window for further review. *Id.* at 418.

■ The petitioner bears the burden of establishing the grounds for relief by a preponderance of the evidence. *Id.* The post-conviction court must make findings of fact and conclusions of law on all issues presented in the petition. *Id.* The findings must be supported by the facts, and the

conclusions must be supported by the law. *Id.* Our review on appeal is limited to those findings and conclusions. *Id.* And where, as here, the post-conviction court denies relief, Hooker appeals from a negative judgment and faces the rigorous burden of showing that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite to that reached by the post-conviction court. *See id.*

### Issue One: Freestanding Claims

■ We first address the State's contention that Hooker has waived his freestanding claims regarding the 1988 oral plea agreement and the 1991 re-sentencing because those claims were known and available on direct appeal. It is well-established that the post-conviction process allows a petitioner to raise challenges that were not known at the time of the original trial or available at the time of the direct appeal. *Ben–Yisrayl v. State,* 738 N.E.2d 253, 258 (Ind.2000), *cert. denied,* 534 U.S. 1164, 122 S.Ct. 1178, 152 L.Ed.2d 120 (2002). Issues that were known and available but not raised on direct appeal are waived and, thus, are unavailable for post-conviction review. *Id.*

Here, Hooker's freestanding claim regarding the 1988 plea agreement was known and available on direct appeal. In addition, Hooker could have appealed from the trial court's 1991 re-sentencing but chose not to do so. We agree with the State that those claims are not available as freestanding claims in the post-conviction proceeding. Instead, we evaluate those arguments only in the context of Hooker's ineffective assistance of counsel claims.

### Issue Two: Ineffective Assistance of Counsel

We next address Hooker's contentions that his appellate counsel and counsel at

---

**3.** While we acknowledge the heavy caseload of Indiana trial courts, we are disappointed that the ruling on Hooker's petition was issued more than two years after the hearing on the matter.

his 1991 re-sentencing were ineffective. He asserts that his appellate counsel was ineffective because he did not challenge the trial court's ruling on the 1988 plea agreement on direct appeal. He also claims that his counsel at his 1991 re-sentencing was ineffective because he failed to object when the court sentenced him in accordance with the statute in effect at the time Hooker committed the crimes, not an amended version of that statute. We address each claim in turn.

## A. Appellate Counsel

Hooker maintains that his appellate counsel was ineffective because he failed to argue on direct appeal that the trial court erred when it granted the State's motion to withdraw its offer and denied Hooker's motion seeking to compel consummation of the parties' plea agreement in 1988. The standard of review for a claim of ineffective assistance of appellate counsel is essentially the same as for trial counsel in that the defendant must show that appellate counsel was deficient in his performance and that the deficiency resulted in prejudice. *Bieghler v. State,* 690 N.E.2d 188, 192–93 (Ind.1997) (citing *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998). The court in *Bieghler* explained:

Under this standard, "[j]udicial scrutiny of counsel's performance must be highly deferential[.]" As the *Strickland* court said:

A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in

making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . .

*Id.* at 192–93 (citations omitted). In addition, like the petitioner in *Bieghler,* Hooker faces an additional burden as one appealing from an adverse ruling of a post-conviction court. *See id.* at 193. Again, as the court in *Bieghler* stated:

First, we require the defendant or petitioner to show that, in light of all the circumstances, the identified acts or omissions of counsel were outside the wide range of professionally competent assistance. This showing is made by demonstrating that counsel's performance was unreasonable under prevailing professional norms. Second, we require the defendant or petitioner to show adverse prejudice as a result of the deficient performance. This showing is made by demonstrating that counsel's performance was so prejudicial that it deprived the defendant or petitioner of a fair trial. We will conclude that a fair trial has been denied when the conviction or sentence has resulted from a breakdown of the adversarial process that rendered the result unreliable.

*Id.* at 193 (citing *Canaan v. State,* 683 N.E.2d 227, 229 (Ind.1997), *cert. denied,* 524 U.S. 906, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998)) (internal citations omitted).

Ineffective assistance of appellate counsel claims generally fall into three basic categories: (1) denial of access to an appeal; (2) waiver of issues; and (3) failure to present issues well. *Id.* 193–94. To show that counsel was deficient for failing to raise an issue on direct appeal, i.e., waiving the issue, the defendant must overcome the strongest presumption of adequate assistance, and judicial scrutiny is highly deferential. *Ben–Yisrayl,* 738

N.E.2d at 261. Our supreme court has adopted the following test to evaluate the performance prong of appellate counsel's performance: (1) whether the unraised issues are significant and obvious from the record; and (2) whether the unraised issues are "clearly stronger" than the raised issues. *Bieghler*, 690 N.E.2d at 194; *Timberlake v. State*, 753 N.E.2d 591, 606 (Ind. 2001), *cert. denied*, 537 U.S. 839, 123 S.Ct. 162, 154 L.Ed.2d 61 (2002). If that analysis demonstrates deficient performance by counsel, the court then examines whether "the issues which ... appellate counsel failed to raise, would have been clearly more likely to result in reversal or an order for a new trial." *Bieghler*, 690 N.E.2d at 194 (citation omitted). Further, the reviewing court must:

> ... consider the totality of an attorney's performance to determine whether the client received constitutionally adequate assistance[,] ... [and] should be particularly sensitive to the need for separating the wheat from the chaff in appellate advocacy, and should not find deficient performance when counsel's choice of some issues over others was reasonable in light of the facts of the case and the

precedent available to counsel when that choice was made.

*Bieghler*, 690 N.E.2d at 194. Ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal. *Id.* at 193 (citation omitted). One reason for this is that the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel. *Id.*

Here, the post-conviction court addressed Hooker's plea agreement claim on the merits, not just in the context of his ineffective assistance of appellate counsel argument. In particular, the post-conviction court analyzed Hooker's plea agreement claim under our supreme court's opinion in *Badger v. State*, 637 N.E.2d 800 (Ind.1994), and determined that the trial court did not err when it granted the State's motion to withdraw its offer based on the two-part test set forth in that case.[4] However, as we have already determined, Hooker's plea agreement argument was known and could have been raised on direct appeal and, thus, is not available as a freestanding claim in his petition for post-conviction relief. *See Ben–Yisrayl*, 738 N.E.2d at 258. Accordingly, our analysis

---

4. In *Badger*, the State and the defendant had entered into a written plea agreement. The trial court had not yet accepted the agreement when the State moved to withdraw the agreement. *Id.* at 801. The court in *Badger* discussed the statutory framework for plea agreements, *see* Ind.Code § 35–35–3–3, and noted that, for a variety of reasons, courts do not always follow the five-step plea agreement process set forth in the statute. The court emphasized that while a trial court has discretion to accept or reject a plea agreement, once it accepts the agreement it is bound by the agreement's terms. *Id.* at 803. The court then stated that it "did not mean to suggest that the statutory framework is sacrosanct," *id.* at 804, and thereafter discussed two cases involving alleged oral agreements between the State and a defendant, namely, *Bowers v.*

State, 500 N.E.2d 203 (Ind.1986), and *Petty v. State*, 532 N.E.2d 610 (Ind.1989). The *Badger* court then stated:

> The lesson of *Bowers* and *Petty* is that courts must enforce agreements between the prosecution and a defendant, *even if those agreements are oral and therefore outside the statutory framework*, either if the State has materially benefited from the terms of the agreement or if the defendant has relied on the terms of the agreement to his substantial detriment.

*Id.* (emphasis in original). Because the trial court in *Badger* had determined that the State had not received a material benefit and the defendant had not relied on the agreement to his detriment, the court affirmed the trial court's decision allowing the State to withdraw the plea agreement. *Id.*

differs from that of the post-conviction court because, in analyzing whether Hooker's appellate counsel's performance was deficient, we are constrained to look at the law regarding plea agreements at the time Hooker filed his appeal. *See Bieghler*, 690 N.E.2d at 193.

Indeed, Hooker directs us to several cases decided after his direct appeal in support of his freestanding claim that the trial court erred when it allowed the State to withdraw its offer. For example, in support of his assertion that once the trial court accepted his guilty plea, it also accepted his plea agreement, Hooker cites to this court's recent opinion in *Benson*, 780 N.E.2d 413, which involved a trial court's order vacating a previously accepted guilty plea and plea agreement on its own motion after receiving letters from social workers objecting to the agreement. Hooker also directs us to our supreme court's opinion in *Reffett v. State*, 571 N.E.2d 1227 (Ind. 1991), in which the court held that a trial court was bound by the terms of a plea agreement once the court had accepted it. But neither *Reffett* nor *Benson* had been decided when Hooker filed his direct appeal in 1989. Similarly, *Badger* was not decided until 1994. Thus, our discussion of those cases is necessarily limited. Instead, we focus on the existing case law on plea agreements in 1989 when Hooker filed his direct appeal.

In *Meadows v. State*, 428 N.E.2d 1232, 1235 (Ind.1981), our supreme court distinguished between a trial court's authority to accept or reject a guilty plea and its even broader authority to accept or reject a plea agreement. In *Griffin v. State*, 461 N.E.2d 1123, 1124 (Ind.1984), the court stated that "[i]t is well-settled that the terms of a plea agreement are binding upon a trial court *when accepted* by the trial court insofar as said terms are within the power of the trial court to or-

der." (statutory citation omitted) (emphasis added). This court followed *Griffin* in *Bartzis v. State*, 502 N.E.2d 1347, 1349 (Ind.Ct.App.1987), when we held that where a trial court had accepted the defendant's guilty plea and then "unequivocally accepted the plea agreement," the court was bound by the terms of that agreement. Thus, *at the time Hooker filed his direct appeal*, the potential success of a claim seeking to enforce the terms of a plea agreement hinged on whether the trial court had, in fact, accepted the plea agreement. *Cf. Steele v. State*, 638 N.E.2d 1338 (Ind.Ct.App.1994) (relying on *Reffett* to hold that trial court could not accept guilty plea without accepting plea agreement and its terms); *Lee v. State*, 652 N.E.2d 113, 114 (holding trial court accepted plea agreement when it accepted guilty plea and entered judgment of conviction); *but see Spencer v. State*, 634 N.E.2d 72, 73–74 (Ind.Ct.App.1994) (rejecting defendant's argument that trial court was bound by plea agreement when it accepted guilty plea where court informed defendant that accepting plea and entering judgment it was not accepting plea agreement), *trans. denied.*

Here, it is undisputed that the trial court established a factual basis for Hooker's guilty plea and entered judgment of conviction on the charges of burglary and robbery, both as Class A felonies. However, we are not convinced that the trial court accepted the parties' plea agreement at the November 1988 guilty plea hearing. First, during the hearing, the trial court advised Hooker that by pleading guilty, he waived certain rights in compliance with Indiana Code Section 35–35–1–2(a). The court also stated as follows:

> Okay. Now the plea agreement that has been referred to, will be reduced to writing and when it is[,][you] be sure it contains all of the conditions reached

between yourself with the help of [defense counsel] and the State of Indiana, and do you understand that the Court is not a party to this agreement, in that *the Court has neither accepted or rejected the agreement?*

(Emphasis added). Hooker replied "yes" to the court's question, indicating that he understood that the agreement would be reduced to writing, that the court was not a party to the agreement, and that the court had neither accepted or rejected the agreement. *Id.* The court then informed Hooker that if the court rejected the agreement, he would be allowed to withdraw his plea of guilty and enter a plea of not guilty. The court further explained that if the court accepted the agreement, the court would be bound by its terms. Thereafter, when the court discussed sentencing, it stated that if it did not accept the agreement, it could consider prior convictions, which might result in a sentence greater than the presumptive term. Our review of the court's advisement as a whole shows that the agreement was to be reduced to writing and, at some later point, again submitted to the court for its acceptance or rejection.

After the court finished the advisement, it stated on the record that it had found a factual basis for the pleas and entered judgment. The court ordered a pre-sentence investigation and scheduled sentencing. The court did not state at any point during the hearing that it had accepted the parties' plea agreement. In addition, the chronological case summary entry for that day provides only that the defendant entered a plea of guilty, and that the court advised him of his constitutional rights, found a factual basis, and found the defendant guilty of robbery and burglary, as Class A felonies. The entry is silent regarding acceptance or rejection of the parties' plea agreement.

After that hearing, Hooker gave a recorded statement in the presence of his counsel and the prosecutor. At the beginning of that statement, the prosecutor outlined the terms of the parties' oral agreement and then asked Hooker whether he understood "that if something bad happens and your plea agreement doesn't go through for whatever reason, that nothing you say here today is going to be used against you in any way at your trial?" Hooker responded that he understood. Further, after Hooker's polygraph results were inconclusive and the State moved to withdraw its offer, Hooker did not argue that the court had already accepted the plea agreement and, thus, was bound by its terms. Rather, Hooker relied on *Bowers v. State,* 500 N.E.2d 203 (Ind.1986), a case that did not involve a plea agreement but rather the enforcement of the State's oral promise not to file charges against the defendant in exchange for the defendant providing information to the State. Given the existing case law available to support an argument that once a plea agreement has been accepted, the court is bound by its terms, *see Griffin,* 461 N.E.2d at 1124, and *Bartzis,* 502 N.E.2d at 1349, Hooker's reliance on *Bowers,* which did not involve an accepted plea agreement, further supports our conclusion that even he did not believe that the court had accepted the agreement. *See Benson,* 780 N.E.2d at 420 (examining behavior of court and parties in determining whether court had accepted guilty plea).

Additionally, during the hearing on the State's motion to withdraw its offer, no one argued or mentioned that the trial court had already accepted the parties' agreement. And according to the court's written order granting the State's motion, the parties' had entered into an agreement but Hooker had failed to abide by the terms of that agreement. Again, while the court

acknowledged in its order that the parties' had reached an agreement, there is no indication in that order that the court had accepted that agreement. Thus, our review of the record shows that the parties and the court understood that the court had not accepted the parties' oral agreement at the guilty plea hearing. *Cf. Bartzis,* 502 N.E.2d at 1349 (holding trial court bound by plea agreement where court had accepted guilty plea and "unequivocally accepted the plea agreement.").

We must now determine whether Hooker has met his difficult burden of establishing that his appellate counsel was deficient because he did not raise the plea agreement issue on direct appeal. Although more recent case law supports Hooker's claim that his plea agreement should have been enforced, the case law at the time he filed his direct appeal indicated that a trial court could accept a guilty plea without being bound by the terms of the underlying plea agreement. *See Griffin,* 461 N.E.2d at 1124; *Bartzis,* 502 N.E.2d at 1349. Indeed, it was not until our supreme court's 1991 decision in *Reffett* that our courts began to hold that acceptance of a guilty plea constitutes acceptance of the corresponding plea agreement. Thus, based on the law at the time of Hooker's direct appeal, we cannot conclude that the trial court's decision to grant the State's motion to withdraw its offer, where the court had not yet accepted the plea agreement, was a "significant and obvious" issue for appeal. *See Bieghler,* 690 N.E.2d at 194.

In addition, Hooker's appellate counsel raised five arguments on direct appeal, one of which was successful and resulted in a reduction of Hooker's sentence from a total term of sixty years to a term of thirty-five years. Therefore, when we "consider the totality of [the] attorney's performance to determine whether the client received constitutionally adequate assistance," *Bieghler,* 690 N.E.2d at 194, Hooker has not met the difficult burden of establishing ineffective assistance of appellate counsel. *Cf. Benson,* 780 N.E.2d at 422 (holding appellate counsel ineffective for failing to raise claim that trial court erred when it vacated accepted guilty plea and plea agreement sua sponte because issue was significant and obvious and counsel had raised only sufficiency of the evidence claim on appeal).[5] We conclude that the post-conviction court's conclusion that Hooker's appellate counsel was not ineffective is not clearly erroneous.

### B. Re–Sentencing Counsel

Hooker also contends that his counsel at his 1991 re-sentencing was ineffective because he failed to object when the trial court sentenced him to a presumptive term of five years on his two Class C felonies. Specifically, Hooker asserts that the presumptive sentence for a Class C felony when he committed his crimes in 1988 was five years. *See* Ind.Code § 35–50–2–6 (1986) ("A person who commits a Class C felony shall be imprisoned for a fixed term of five (5) years, with not more than three (3) years added for aggravating circumstances or not more than three (3) years subtracted for mitigating circumstances."). But in 1990, the General Assembly reduced the presumptive sentence for a Class C felony to four years. *See* P.L. 167–1990, Sec. 1, emerg. eff. April 1, 1990 (in first sentence, substituted "four (4)" for

---

5. While Hooker and the defendant in *Benson* would have filed their direct appeals around the same time, our outcome here is consistent with that in *Benson* because, unlike in this case, it is undisputed that the trial court had accepted the parties' plea agreement in *Benson. See* 780 N.E.2d at 420 (discussing court order in which court affirmatively stated that it had accepted plea agreement).

"five (5)," substituted "four (4)" for "three (3)," and substituted "two (2)" for "three (3)"). Hooker contends that when he was re-sentenced following his direct appeal in 1991, he was entitled to be sentenced under the amended statute under the doctrine of amelioration. We cannot agree.

 The post-conviction court correctly determined that courts must generally sentence defendants under the statutes in effect at the time the defendant committed the offense. *Palmer v. State,* 679 N.E.2d 887, 892 (Ind.1997). When, however, the legislature enacts an ameliorative amendment without including a specific savings clause, the new statute will apply to all those sentenced after its effective date. *Id.* The test to determine whether the legislature has enacted an ameliorative statute is whether the maximum penalty under the new statute is lower than the maximum penalty under the old statute. *Id.,* n. 4 (citing *Davis v. State,* 271 Ind. 676, 395 N.E.2d 232, 234 (1979); *Lunsford v. State,* 640 N.E.2d 59, 61 (Ind.Ct.App.1994)).

Here, when the legislature reduced the presumptive term for a Class C felony from five to four years, it did not include a specific savings clause in the statute. Still, both before and after the 1990 amendment, the maximum term remained the same, namely, eight years. Specifically, under the old law, the presumptive term was five years, and three years could be added for aggravating circumstances. Under the current law, the presumptive term is four years, and four years may be added for aggravating circumstances. Thus, we agree with the post-conviction court that the 1990 amendment to Indiana Code Sec-

tion 35–50–2–6 was not ameliorative under the test set forth in *Palmer* because it did not alter the *maximum* sentence for a Class C felony. Therefore, Hooker was not entitled to be sentenced to the presumptive term of four years instead of five years, and his counsel was not ineffective when he failed to object at the 1991 re-sentencing hearing.

## Issue Three: Attempted Murder and Accomplice Liability Instructions

Hooker also asserts that the post-conviction court erred when it determined that his claim regarding the attempted murder instructions is barred by res judicata. Specifically, he contends that despite this court's prior determination on direct appeal that the instructions were adequate, we should re-examine the issue "under principles of fundamental fairness." In addition, Hooker asserts that not only were the attempted murder instructions inadequate, but the instruction which would have permitted the jury to convict him of attempted murder as an accomplice also constitutes fundamental error under our supreme court's opinions in *Bethel v. State,* 730 N.E.2d 1242 (Ind.2000), and *Williams v. State,* 737 N.E.2d 734 (Ind. 2000).[6] We address each of his claims in turn.

### A. Res Judicata

 The doctrine of res judicata bars a later suit when an earlier suit resulted in a final judgment on the merits, was based on proper jurisdiction, and involved the same cause of action and the same parties or privies as the later suit. *Annes v. State,* 789 N.E.2d 953, 954 (Ind.2003). Hooker

---

**6.** Although Hooker raised his argument on the accomplice liability instruction to the post-conviction court, the post-conviction court did not address the issue. Rather, the post-conviction court concluded that further

argument on the attempted murder instructions was barred by res judicata and that the instructions as a whole nevertheless adequately instructed the jury on the specific intent to kill requirement.

argues that res judicata does not bar further review of his attempted murder jury instruction argument because his argument on direct appeal focused on the trial court's refusal of Defendant's Instruction No. 3, while his present argument focuses on the inadequacies of Court's Instruction No. 12. However, we agree with the post-conviction court's conclusion that, in our 1990 memorandum decision, we not only addressed his claim regarding his tendered instruction, but we also looked at the remaining jury instructions and determined that the "instructions as a whole correctly inform[ed] the jury of all elements of Attempted Murder." *Hooker*, slip op. at 10. Contrary to Hooker's contention, we have already addressed the same claim that he now raises in his post-conviction petition. We agree with the post-conviction court that Hooker's attempted murder jury instruction argument is barred by res judicata.

■■ Still, Hooker directs us to *State v. Huffman*, 643 N.E.2d 899, 901 (Ind.1994), in which our supreme court suggested that, despite the doctrine of res judicata, courts may always revisit prior decisions where the initial decision was clearly erroneous and would work a manifest injustice. In this case, after the post-conviction court concluded that res judicata barred further review of Hooker's claim, the court nevertheless addressed his claim on the merits. Our review of the post-conviction court's conclusions on this issue show that, consistent with our prior decision on direct appeal, the instructions as a whole adequately informed the jury that to convict Hooker of attempted murder, the State was required to prove specific intent to kill. In particular, despite the problems Hooker points out with Court's Instruction No. 12, Court's Instructions No. 15 and No. 16 inform the jury of the specific intent requirement. *See Yerden v.*

*State,* 682 N.E.2d 1283, 1286 (Ind.1997) (holding instruction, when viewed in its entirety, adequately informed jury of specific intent requirement where the last two sentences of the instruction stated that defendant must have specific intent to kill); *see also Greenlee v. State,* 655 N.E.2d 488, 492 (Ind.1995) (holding instructions as whole sufficient to inform of specific intent requirement where instructions mentioned intent to kill, intent to commit murder, and specific intent at three different points). Thus, Hooker has not demonstrated the post-conviction court clearly erred on this issue.

### B. Accomplice Liability

Hooker also asserts that the trial court committed fundamental error when it instructed the jury on accomplice liability. Specifically, he maintains the Court's Instruction No. 30 allowed the jury to convict him of attempted murder as the non-shooting or non-hitting accomplice without finding that he had the specific intent to kill. He directs us to *Bethel v. State,* 730 N.E.2d 1242 (Ind.2000), and *Williams v. State,* 737 N.E.2d 734 (Ind.2000), to support his argument that the Court's Instruction No. 30, which contains a "knowingly or intentionally" mens rea, failed to instruct the jury adequately on the specific intent requirement as it relates to accomplice liability. Rather, Hooker contends that to convict him of attempted murder on a theory that he aided or abetted the other intruder, the State was required to prove: (1) that Hooker, acting with the specific intent to kill, took a substantial step toward the commission of murder, and (2) that Hooker, acting with the specific intent that the killing occur, knowingly or intentionally aided, induced, or caused the other intruder to commit the crime of attempted murder. *See Bethel,* 730 N.E.2d at 1246.

This court addressed a similar argument in *Cowherd v. State,* 791 N.E.2d 833 (Ind.Ct.App.2003), *trans. denied.* In that case, the State argued that the defendant had waived his jury instruction claim because, although *Bethel* and *Williams* had not yet been decided, the jury instruction claim was known and available to the defendant on direct appeal. We agreed and stated that the court in *Bethel* "did not announce new law." *Id.* at 838. Rather, as the court in *Williams,* 737 N.E.2d at 740–41, n. 16, noted, the *Bethel* decision "explained what the State was already required to prove to gain a conviction for attempted murder under a complicity theory or otherwise: '[T]he same specific intent to kill must be shown for an attempted murder as for the crime of murder.'" (citations omitted). Thus, we determined in *Cowherd* that the issue of the accomplice liability instructions was available to the defendant at the time of his direct appeal. Consequently, we concluded that the defendant had waived review of his fundamental error argument as a freestanding claim. *Id.*

Here, just as in *Cowherd,* Hooker's contention that the jury instruction on accomplice liability as it relates to attempted murder constitutes fundamental error was available on direct appeal. We have already stated that issues that were known and available but not raised on direct appeal are waived for purposes of post-conviction review. *Ben–Yisrayl,* 738 N.E.2d at 258. Therefore, following *Cowherd,* we conclude that Hooker has waived review of his accomplice liability jury instruction argument as a freestanding claim on post-conviction review.

Affirmed.

ROBB, J., and MATHIAS, J., concur.