# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 29 2018, 5:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Jonathan O. Chenoweth
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McClean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Thomas E. Booker,<br>*Appellant-Petitioner,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | June 29, 2018<br><br>Court of Appeals Case No.<br>49A02-1710-PC-2379<br><br>Appeal from the Marion Superior Court, Criminal Division 3<br><br>The Honorable Sheila A. Carlisle, Judge<br><br>The Honorable Stanley E. Kroh, Magistrate<br><br>Trial Court Cause No.<br>49G03-1504-PC-11935 |

**Mathias, Judge.**

Following his convictions for Class B felony criminal deviate conduct and his unsuccessful direct appeal, Thomas E. Booker ("Booker") filed a petition for post-conviction relief in Marion Superior Court. The post-conviction court denied the petition, and Booker appeals and presents two issues for our review, which we restate as whether the post-conviction court clearly erred in determining that Booker was not denied the effective assistance of both trial and appellate counsel.

We affirm.

## Facts and Procedural History

The facts underlying Booker's conviction were set forth by this court in our memorandum decision on direct appeal as follows:

> In 2013, forty-nine-year-old B.M. suffered a stroke, which left her speech-impaired, paralyzed on her left side, and wheelchair-bound. After a lengthy hospital stay, she was transferred to Rosewalk Village ("Rosewalk") skilled nursing facility in Indianapolis for rehabilitation. During her three-month stay at Rosewalk, her adult son Kendall often visited her. During one visit, Kendall encountered Booker, whom he and B.M. had known as an acquaintance from church. Booker explained that his wife was a patient at Rosewalk, and he asked the location of B.M.'s room. Thereafter, Booker visited with Kendall and B.M. from time to time.
>
> Between 9:00 and 10:00 p.m. on Friday, October 4, 2013, after B.M. had been tucked in by Rosewalk staff, Booker entered her room. She awoke to find Booker sitting on her bed. Booker touched her breasts and digitally penetrated her vagina, and she

asked him to stop and to leave. At first, he did not stop. She then told him that Kendall was due to arrive soon, and he left.

The next day, B.M. reported the incident to Rosewalk personnel. By Sunday, Kendall was aware of the incident. When he came to visit his mother, he saw Booker and confronted him. He told a Rosewalk employee to call the police because Booker was the person who had assaulted his mother. When Booker attempted to get to his vehicle to leave, Kendall took his keys from him. Booker then pled with Kendall to give him the keys because the police were on their way. When Kendall refused, Booker fled to a nearby building, where police apprehended him.

Footage from a hallway surveillance camera showed Booker entering B.M.'s room on the night of the assault. During an interrogation, Booker admitted to Detective Michael Hewitt that he had entered B.M.'s room that night.

*Booker v. State*, No. 49A02-1402-CR-107, 2014 WL 4473647, slip op. at 2–3 (Ind. Ct. App. Sept. 11, 2014).

[4] As a result of these acts, the State charged Booker with Class B felony criminal deviate conduct and Class D felony sexual battery. The State also alleged that Booker was a repeat sexual offender. A jury trial was held on January 15, 2014. At the conclusion of the State's case-in-chief, Booker's trial counsel moved for a directed verdict, which the trial court denied. The jury convicted Booker of Class B felony criminal deviate conduct, but acquitted him on the charge of sexual battery. Booker then admitted to being a repeat sexual offender. The trial court sentenced Booker to twenty-five years on the criminal deviate conduct conviction and imposed a ten-year repeat-sexual-offender enhancement.

[5] Booker appealed and argued that there was insufficient evidence to support his conviction and that the trial court committed fundamental error by admitting into evidence a statement that he made to the investigating detective during interrogation in which he admitted that he went into B.M.'s room on the night that she was molested. We held that the evidence was sufficient to support Booker's convictions and that the trial court did not commit any error, let alone fundamental error, in the admission of Booker's statement. *Id*. at 3–4.

[6] On April 6, 2015, Booker filed a *pro se* petition for post-conviction relief. The post-conviction court appointed counsel from the State Public Defender's office to represent Booker, who then filed an amended petition on December 9, 2015. The trial court held an evidentiary hearing on Booker's petition on March 15, 2016. On September 20, 2017, the post-conviction court entered findings of fact and conclusions of law denying Booker's petition. Booker now appeals.

## Discussion and Decision

### Post-Conviction Standard of Review

[7] Our standard of review of claims that a post-conviction court erred in denying relief is well settled. That is, post-conviction proceedings are not "super appeals" through which convicted persons can raise issues they failed to raise at trial or on direct appeal. *Manzano v. State*, 12 N.E.3d 321, 325 (Ind. Ct. App. 2014) (citations omitted), *trans. denied*. Instead, post-conviction proceedings afford petitioners a limited opportunity to raise issues that were unavailable or unknown at trial and on direct appeal. *Id*. A post-conviction petitioner bears the

burden of establishing grounds for relief by a preponderance of the evidence. Thus, on appeal from the denial of post-conviction relief, the petitioner stands in the position of one appealing from a negative judgment. *Id*. To prevail on appeal from the denial of post-conviction relief, the petitioner must show that the evidence as a whole leads unerringly and unmistakably to a conclusion opposite that reached by the post-conviction court. *Id*.

[8] As required by Indiana Post-Conviction Rule 1(6), the post-conviction court entered findings of fact and conclusions of law. Therefore, we must determine if the court's findings are sufficient to support its judgment. *Id*. We review the post-conviction court's factual findings under a clearly erroneous standard, i.e., we will not reweigh the evidence or judge the credibility of witnesses, and we will consider only the probative evidence and reasonable inferences flowing therefrom that support the post-conviction court's decision. *Id*. We do not defer to the post-conviction court's legal conclusions, which are reviewed *de novo*. *Stevens v. State*, 770 N.E.2d 739, 746 (Ind. 2002).

## I. Ineffective Assistance of Trial Counsel

[9] All of Booker's post-conviction claims raise the question of the effective assistance of counsel. In *Timberlake v. State,* our supreme court summarized the law regarding claims of ineffective assistance of trial counsel as follows:

> A defendant claiming a violation of the right to effective assistance of counsel must establish the two components set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). First, the defendant must show that counsel's performance was deficient. This requires a showing that counsel's representation fell below

an objective standard of reasonableness, and that the errors were so serious that they resulted in a denial of the right to counsel guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Counsel is afforded considerable discretion in choosing strategy and tactics, and we will accord those decisions deference. A strong presumption arises that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. The *Strickland* Court recognized that even the finest, most experienced criminal defense attorneys may not agree on the ideal strategy or the most effective way to represent a client. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. The two prongs of the *Strickland* test are separate and independent inquiries. Thus, if it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed.

753 N.E.2d 591, 603 (Ind. 2001) (citations and quotations omitted).

*A. Failure to Cite Case Law in Motion for Directed Verdict*

[10] Booker first claims that his trial counsel was ineffective for failing to cite authority when moving for a directed verdict. This argument falls within the category of "inadequate presentation" of an issue. Our supreme court has held that such claims, "are the most difficult for convicts to advance and reviewing tribunals to support." *Bieghler v. State*, 690 N.E.2d 188, 195 (Ind. 1997) (citing Lissa Griffin, *The Right to Effective Assistance of Appellate Counsel*, 97 W. Va. L.

Rev. 1, 23 (1994)). An ineffectiveness challenge resting on counsel's presentation of a claim must overcome the strongest presumption of adequate assistance, and "[j]udicial scrutiny of counsel's performance, already highly deferential, is properly at its highest." *Id*.

[11] As noted above, Booker claims that, had his trial counsel cited case law in support of his motion for a directed verdict, then the trial court would have been more likely, even required, to have granted it. Booker's argument is based upon a series of cases that he claims show that his conduct, as a matter of law, did not rise to the level of force required to sustain a conviction for deviate sexual conduct. This argument requires us to look at the statutory elements of the crime of deviate sexual conduct, the evidence that supported Booker's convictions, and the case law he claims should have been cited by his trial counsel.

[12] The crime of Class B felony deviate sexual conduct was, at the time Booker committed his crime, defined as follows:

> A person who knowingly or intentionally causes another person to perform or submit to deviate sexual conduct when:
>
> > (1) the other person is compelled by force or imminent threat of force;
> >
> > (2) the other person is unaware that the conduct is occurring; or
> >
> > (3) the other person is so mentally disabled or deficient that consent to the conduct cannot be given;
>
> commits criminal deviate conduct, a Class B felony.

Ind. Code § 35-42-4-2(a) (1998).[1] The term "deviate sexual conduct" was in turn defined as "an act involving: (1) a sex organ of one person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Ind. Code § 35-41-1-9 (1984).[2]

[13] In support of his claim, Booker cites five cases that he claims his trial counsel should have cited in support of the motion for a directed verdict.

[14] This line of cases begins with *Scott-Gordon v. State*, 579 N.E.2d 602 (Ind. 1991). In that case, the defendant was convicted of three counts of sexual battery and, on appeal, argued that there was insufficient evidence of force. *Id.* at 603. In addressing this claim, the court first observed that there were then no reported cases discussing the nature or amount of force required to support a conviction for sexual battery. *Id.* at 604. But the wording of the sexual battery statute with regard to force used the same language as the rape statute with regard to force. *Id.* Therefore, the court looked to cases interpreting the rape statute and noted that the requisite force "need not be physical or violent, but may be implied from the circumstances." *Id.* (citing *Jenkins v. State*, 267 Ind. 543, 545, 372

---

[1] We note that this statute was repealed effective July 1, 2014, as part of the overhaul of Indiana's criminal code. Because Booker committed his crimes prior to that date, we apply the statute in effect at the time he committed the offense.

[2] This statute too was repealed effective July 1, 2014, and was effectively replaced by Indiana Code section 35-31.5-2-221.5, which similarly defines what is now referred to as "other sexual conduct" as "an act involving: (1) a sex organ of one (1) person and the mouth or anus of another person; or (2) the penetration of the sex organ or anus of a person by an object." Conduct which, prior to July 1, 2014, would have constituted criminal deviate conduct is now criminalized in the revised criminal code as rape. *See* Ind. Code § 35-42-4-1(a) (defining rape to include knowingly or intentionally forcing another person to perform or submit to sexual intercourse or "other sexual conduct").

N.E.2d 166, 167 (1978)). Applying this rule to the facts before it, the court held that, with regard to the first two counts, the defendant had grabbed the victim's hand and placed it on the defendant's penis and forced his hand inside the victim's pants in order to touch his penis, all over the victim's protestations and repeated refusals. *Id*. The defendant's actions required the victim to physically remove the defendant's hand and place it on the steering wheel of the vehicle they were in. *Id*. This evidence, the court held, supported a factual finding that the victim was compelled to submit to the touching by physical force. *Id*.

[15] With respect to the third count, however, the evidence revealed that the defendant approached a second victim from behind, grabbed his buttocks, and told him that he had just received a "free feel." *Id*. This caused this victim to jump back and punch the defendant in the eye. *Id*. There was no evidence that the defendant made any threats to the victim or that the victim was afraid of the defendant. *Id*. This evidence, the court concluded did not support a finding that the defendant compelled the victim to submit to the touching by force or imminent threat of force. *Id*. The court noted that "not all touchings intended to arouse or satisfy sexual desires constitute sexual battery; only those in which the person touched is compelled to submit by force or the imminent threat[.]" *Id*. Because there was no evidence of compulsion by force or threat of force, the court reversed the defendant's conviction on this count of sexual battery. *Id*.

[16] The next case Booker claims his trial counsel should have cited is *Jones v. State*, 589 N.E.2d 241 (Ind. 1992), in which the twenty-six-year-old victim lived in the same house with the defendant, the defendant's wife, and their child. *Id*. at 242.

One night, when Jones had been drinking, he came into the victim's bedroom and asked her to have sex with him. *Id*. She declined, saying that the defendant should have sex with his wife and that if she had sex with him, it would be unfair to the defendant's family. *Id*. When the defendant asked the third time, however, she, in her own words, "just let him have it, you know." *Id*. Although the victim did not give explicit permission for the defendant to have sex with her, she did not cry out for help. *Id*. The defendant also told the victim not to tell anyone what had happened. *Id*. The victim later explained that she was afraid of Jones, his wife, and her own foster mother. *Id*.

[17]     On appeal, the defendant argued that the evidence was insufficient to support his conviction for rape because there was no evidence that he compelled the victim by force or imminent threat of force. *Id*. Our supreme court agreed, concluding that there was no evidence that the defendant used any force or threats to encourage the victim to engage in sexual intercourse. *Id*. at 243. He simply asked her three times, and on the third time she "just let him have it." *Id*. Nor was there any evidence of any previous threats or force against the victim from which the trier of fact could infer a fear of force or threats on this occasion. *Id*. Although the victim stated she was afraid to yell for help, there was no evidence she was afraid because Jones had forced her to do anything or threatened her. *Id*. And, the court held, "[t]here are reasons a person might be afraid to attract attention other than fear of forced activity." *Id*.

[18]     Booker also claims that his trial counsel should have cited *Chatham v. State*, 845 N.E.2d 203 (Ind. Ct. App. 2011). In *Chatham*, the victim was taking a walk and

saw the defendant while she was walking, but she did not know him. *Id*. at 205. While the victim was walking, the defendant came up behind her and grabbed with his hand in between her thighs and her crotch "as far as [he] could." *Id*. The victim turned around and stood face to face with the defendant. *Id*. She was scared and started walking away, at which point the defendant ran away. *Id*. The defendant was charged and convicted of sexual battery. *Id*.

[19] On appeal, the defendant argued that there was insufficient evidence that the victim was compelled to submit to the touching by force or the imminent threat of force. *Id*. at 206–07. The *Chatham* court first noted:

> Evidence that a victim did not voluntarily consent to a touching does not, in itself, support the conclusion that the defendant compelled the victim to submit to the touching by force or threat of force. **However, it is the victim's perspective, not the assailant's, from which the presence or absence of forceful compulsion is to be determined. This is a subjective test that looks to the victim's perception of the circumstances surrounding the incident in question.** The issue is thus whether the victim perceived the aggressor's force or imminent threat of force as compelling her compliance.

*Id*. at 207 (emphasis added) (citations and internal quotations omitted). The court ultimately agreed with the defendant, noting that the victim did not experience any fear until after the defendant had grabbed her. *Id*. Thus, her fear following the incident could not indicate that she was compelled to submit to the touching by force or the imminent threat of force. *Id*. Considering itself bound by the *Scott-Gordon* opinion, the court in *Chatham* held that there was

insufficient evidence that the victim had been compelled by force or imminent threat of force and reversed his conviction for sexual battery.[3] *Id.* at 208.

[20] The next case Booker refers to is *Smith v. State*, 678 N.E.2d 1152 (Ind. Ct. App. 1997), *trans. denied*, a case in which the defendant challenged the sufficiency of the evidence for two of his convictions for sexual battery. The evidence supporting the first conviction showed that the victim, the victim's friend, and the defendant's son were returning from a trip in Smith's vehicle. *Id.* at 1155. After the defendant dropped off the victim's friend, he reached into the back seat where the victim was sleeping, unbuttoned his pants and fondled the boy's penis. *Id.* After the defendant stopped fondling him, the victim pulled away and rolled over on the seat. *Id.* The victim testified that he had no reason to be afraid of Smith before the incident and that he did not say anything to the defendant while he was fondling him because he "didn't know what to do." *Id.*

[21] On appeal, the court concluded that, although it was clear that the victim did not consent to the touching, this was by itself insufficient to support a conclusion that the defendant compelled the victim to submit to the touching by force or threat of force. *Id.* (citing *Scott–Gordon*, 579 N.E.2d at 604). Because there is no evidence that the victim was compelled to submit to Smith's touching by force or the imminent threat of force, the touching, although it may have constituted battery, did not constitute a sexual battery as defined by the

---

[3] The court remanded with instructions that the trial court enter a judgment of conviction for Class B misdemeanor battery instead. *Id.*

statute. *Id.* The court therefore reversed the defendant's conviction on this count. *Id.*

[22]    As to the other count of sexual battery, the court again held that there was insufficient evidence to support a conclusion that the victim was compelled to submit to the touching by force or imminent threat of force. *Id.* Again, on the way home from a trip, the young victim was sleeping in the front seat of the defendant's truck when he awoke to find the defendant sliding his hand up his shorts and grabbing his penis. *Id.* The victim did not say anything to the defendant and did not discuss it with him thereafter. *Id.* The court concluded, "although the touching was clearly not consented to, there is no evidence that [the victim] was compelled to submit to the touching by force or the imminent threat of force." *Id.*

Lastly, Booker claims his trial counsel should also have cited *McCarter v. State*, 961 N.E.2d 43 (Ind. Ct. App. 2012), *trans. denied*, in support of his motion for a directed verdict. In *McCarter*, the sixteen-year-old victim had been stopped for shoplifting at a store. *Id.* at 44. While the victim sat on a bench near the front of the store, the defendant approached her and falsely claimed to be a police officer. *Id.* He took the victim outside the store and claimed he could keep her out of trouble. *Id.* He also attempted to get the victim to sit in his truck, but she declined. *Id.* at 44–45. Eventually, the defendant asked the victim for a hug for helping her out, which she did. *Id.* at 45. The victim then agreed to go with the defendant to the side of the store. *Id.* There, in a dimly lit area, he asked for a kiss, which she refused. *Id.* He then asked for a kiss on the cheek, which she

agreed to. *Id*. However, when she did so, the defendant "grabbed [her] closer and tried to kiss [her]" and "put his hands on [her] and like pushed [her] butt[.]" *Id*. The victim told the defendant to "get off" of her, and he released her and walked away. *Id*. As he left, he seemed angry and yelled that she would be getting a letter in the mail. *Id*. The defendant was ultimately convicted *inter alia* of sexual battery. *Id*.

[23] On appeal, the defendant claimed that the evidence was insufficient to support a finding that he compelled the victim to submit to the touching by force or imminent threat of force. *Id*. at 46. This court again noted that:

> [F]ear is not an element of sexual battery. Nor is fear a prerequisite to proving force or imminent threat of force. However, it may be evidence of force or threat of force. Again, force may be implied from the circumstances, and we must consider the victim's perspective in order to determine the presence or absence of forceful compulsion.

*Id*. (citations and internal quotations omitted). The *McCarter* court found the facts before it to be analogous to those present in *Smith*, *supra*. The victim did not voluntarily submit to the touching, and the defendant withdrew his hands after the victim told him to "get off of her." *Id*. at 47. Still, however, although the touching itself may have occurred with some force, there was no indication that the victim was compelled to submit to it by force or threat of force. *Id*. Accordingly, the court held that the State did not prove the element of

compulsion by force or threat of force and reversed McCarter's conviction for sexual battery.[4] *Id.*

[24] As set forth above, Booker contends that, had his trial counsel cited one or more of these cases, the trial court would have been required to grant his motion for a directed verdict. We disagree.

[25] First, we do not believe the cases Booker claims his trial counsel should have cited were unknown the trial court. To the contrary, we presume that trial courts know and follow the applicable law. *Thurman v. State*, 793 N.E.2d 318, 321 (Ind. Ct. App. 2003) (citing *Moran v. State*, 622 N.E.2d 157, 159 (Ind. 1993)). In fact, the opinion in *Scott-Gordon* was issued over twenty years before Booker's trial, and we may safely presume that the trial court was aware of the discussions of "force" set forth in the applicable case law.

[26] Moreover, we disagree with Booker that these cases were controlling on the issue of his motion for a directed verdict. Booker claims that these cases demonstrate what does *not* constitute force or the imminent threat of force, i.e., vulnerability, fear after the act, lack of consent, and silence. Appellant's Br. at 30. To be sure, *Chatham* held that the victim's fear must *precede* the touching in order to support a finding "that the victim was compelled to submit to the touching by force or the imminent threat of force." 845 N.E.2d at 207. And

---

[4] The court remanded with instructions that the trial court enter a judgment of conviction for Class B misdemeanor battery. *Id.* at 48.

*McCarter* held that the lack of consent was not, in itself, sufficient to support a finding of force or imminent threat of force. 961 N.E.2d at 47. There is also support for the proposition that the victim's silence is, by itself, insufficient to support a finding of the requisite fear. In *Jones* the court noted that the victim did not cry out for help. 589 N.E.2d at 242. And in *Smith*, the victim did not say anything when he realized the defendant was fondling him. 678 N.E.2d at 1155. As to the victim's vulnerability, this by itself might not be sufficient, but we believe that it can properly be considered as part of the totality of the circumstances when determining whether the victim was compelled to submit to the touching by force or imminent threat of force.

[27] In the present case, the evidence adduced at trial showed more than mere vulnerability, fear after the act, lack of consent, or silence. To the contrary, here, the victim was clearly vulnerable, more so than any of the able-bodied victims in the above-cited cases. She was bed-ridden and partially paralyzed as the result of a stroke. She also clearly did not consent to Booker's behavior, but neither was she silent. In fact, she told Booker to stop and even lied to Booker that her son was arriving soon in order to get him to leave.

[28] Booker claims that the evidence shows that he immediately stopped when B.M. asked him to stop. *See* Appellant's Br. at 32 ("When she told him to stop, he stopped and stood up from the bed."). But the evidence regarding this is not so clear. B.M. testified at trial as follows:

> Q. So what part of his body was touching what part of your body?

A.    His hand — his hand — his hand was touching my vagina.

Q.    Okay. And you said his hand was touching your vagina. Was his hand still or moving or something else?

A.    Yes.

Q.    Which one?

A.    He stuck his hand in between my vagina and began to fondle me.

Q.    Okay. So at this point, Ms. [M.], what did you do?

A.    I told him, I said, "Thomas, what are you doing? He said, "Nothing." I told him to leave.

Q.    Okay. So you said, "Thomas, what are you doing," he said "nothing" and you told him to leave?

A.    Yes.

Q.    Okay. What happened after he put his hand in your vagina?

A.    I told him to stop.

Q.    Okay. And what happened next?

A.    I told him to leave.

Q.    And what did he do?

A.    He got up.

Trial Tr. pp. 63–64.

[29]    From this, the jury could reasonably conclude that B.M. asked Booker to leave when he began to fondle her. Implicit in this is a request that Booker stop

fondling her. But Booker did not immediately stop, and did not stop until B.M. explicitly told him to do so. In fact, B.M. testified that Booker fondled her vagina for approximately five minutes. Thus, this was not a brief touching as was the case in *Scott-Gordon, Chatham, or McCarty*. Nor was B.M. silent as in *Jones* or *Smith*. Moreover, even after B.M. explicitly told him to stop, Booker fondled her breasts, got up, and began to unfasten, or prepared to unfasten, his pants. Only when B.M. falsely told Booker that her son was going to arrive soon did Booker stop and leave the room.

[30] Considering all of these circumstances, we are of the opinion that none of the cases that Booker now claims that his trial counsel should have cited in support of his motion for a directed verdict would have required the trial court to grant the motion. Thus, his trial counsel's failure to cite any these cases did not result in any prejudice Booker.

### B. Failure to Object to Prosecutor's Statements

[31] Booker also claims that his trial counsel was ineffective for failing to object to certain statements made by the prosecuting attorney during the State's closing argument at trial. Specifically, Booker claims that his trial counsel should have objected when the prosecutor stated, "force happens when it's against her will," Trial Tr. pp. 225–26, and later stated, "[B.M.] cannot get from the bed to the wheelchair or wheelchair to the bathroom without help. She can't go anywhere. She is stuck. That is the definition of force. Something we all talked about in jury selection, something that you don't want to happen to you. She did not give him permission." *Id*. at 245–46. Booker claims that the prosecutor

misstated the law and that his trial counsel should have objected to these misstatements.

[32] Even if Booker's trial counsel had objected to these statements, we cannot say that the result of his trial would have been different. The trial court instructed the jury with regard to the required element of force, and Booker makes no claim that the trial court's instructions were improper. We presume that the jury followed the instructions it was given. *Thrash v. State*, 88 N.E.3d 198, 205 (Ind. Ct. App. 2017). The prosecuting attorney's statements were argument, and even if Booker's trial counsel had objected to these statements, there is no reasonable probability that the result of his trial would have been different. Thus, the post-conviction court did not clearly err in rejecting Booker's claim of ineffective assistance of trial counsel for failure to object to these statements by the prosecuting attorney.

## II. Ineffective Assistance of Appellate Counsel

[33] Booker also claims that the post-conviction court clearly erred by rejecting his claim of ineffective assistance of appellate counsel. When we review claims of ineffective assistance of appellate counsel, we use the same standard we apply to claims of ineffective assistance of trial counsel, i.e., the petitioner must show that appellate counsel's performance fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the deficient performance of counsel, the result of the proceeding would have been different. *Manzano*, 12 N.E.3d at 329 (citing *Harris v. State*, 861 N.E.2d 1182, 1186 (Ind. 2007)).

[34] As noted above, when the claim of deficient performance is one of inadequate presentation of issues, the claim of ineffective assistance almost always fails. *Bieghler*, 690 N.E.2d at 195. As explained by the court in *Bieghler*:

> First, these claims [of inadequate presentation of issues] essentially require the reviewing tribunal to re-view specific issues it has already adjudicated to determine whether the new record citations, case references, or arguments would have had any marginal effect on their previous decision. Thus, this kind of ineffectiveness claim, as compared to the others mentioned, most implicates concerns of finality, judicial economy, and repose while least affecting assurance of a valid conviction.

> Second, an Indiana appellate court is not limited in its review of issues to the facts and cases cited and arguments made by the appellant's counsel. We commonly review relevant portions of the record, perform separate legal research, and often decide cases based on legal arguments and reasoning not advanced by either party. While impressive appellate advocacy can influence the decisions appellate judges make and does make our task easier, a less than top notch performance does not necessarily prevent us from appreciating the full measure of an appellant's claim, or amount to a breakdown in the adversarial process that our system counts on to produce just results.

> \* \* \*

> **When the issues presented by an attorney are analyzed, researched, discussed, and decided by an appellate court, deference should be afforded both to the attorney's professional ability and the appellate judges' ability to recognize a meritorious argument.**

> For these reasons, an ineffectiveness challenge resting on counsel's presentation of a claim must overcome the strongest presumption of adequate assistance. Judicial scrutiny of counsel's performance, already highly deferential, is properly at its highest.

> Relief is only appropriate when the appellate court is confident it would have ruled differently.

*Id.* at 195–96 (emphasis added) (citations and internal quotations omitted).

[35] Here, a panel of this court reviewed Booker's appellate claim of insufficient evidence and rejected it. We do not think that the failure of Booker's appellate counsel to cite any or all of the cases Booker now claims should have been cited would have altered this court's opinion. In fact, we are confident that the panel that decided Booker's direct appeal was well aware of the case law regarding the proof required to establish compulsion by force or imminent threat of force. Indeed, the State cited *Scott-Gordon* in its appellee's brief on direct appeal. Thus, that case and its progeny were before this court on direct appeal. Booker's current claim is little more than a request that we reconsider our opinion on direct appeal in light of the cases he now cites. This is the sort of claim that our supreme court has warned "most implicates concerns of finality, judicial economy, and repose while least affecting assurance of a valid conviction." *Bieghler*, 690 N.E.2d at 195.

[36] In short, we can confidently say that even if Booker's appellate counsel had cited the cases he now claims should have been cited in support of his appellate claim of insufficient evidence, the result would have been the same, i.e., we would have affirmed his convictions. His claim of ineffective assistance of appellate counsel therefore fails.

# Conclusion

[37] For all of these reasons, we conclude that the post-conviction court did not clearly err in concluding that Booker was not denied the effective assistance of trial or appellate counsel.

[38] Affirmed.

Riley, J., and May, J., concur.